# IN THE UNITED STATES DISTRICT COURT OF ARIZONA

————————————————X

Mitch Taebel,

          Plaintiff.

   v.

Michael Sonberg,

          Defendant.

————————————————X

**Filed** ___ **Lodged**
___ **Received** ___ **Copy**

**JAN 0 5 2018**

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

Case

**CV-18-00046-PHX-BSB**

Judge_____

## *Complaint*

This petitioner claims damages for defamation from unlawful ruling by a Judge in a case without probable cause in violation of the fourth Amendment. The Judge's conduct was unconstitutional and in violation of obligations of Due Process. All of which in violation of 18 U.S.C. Section 242.

Petitioner has recently been denied an Apartment Complex Application in the State of Arizona. Petitioner's Name searched in Public Media, Records and Background checks reflects this unlawful charge in detriment to his professional image.

After the Trial in January 2013, The Judge Stated three times on the record he doubted the sufficiency of evidence to sustain the Charge. However, he then Denied two separate motions to Vacate the Charge. (Exhibit B, C)
Exhibits (A-F) are in support of this complaint.

This Petitioner seeks damages in the amount of 500,000,000 USD.

Dated: December 30, 2017

In Oath and Affirmation,

Mitch  Taebel
15841 North 56th Way
Scottsdale, Az 85254

# EXHIBIT A

*Supporting Law Citing*:

S35.15 JUSTIFICATION OF THE USE OF FORCE IN DEFENSE OF A PERSON.

BROWN V. UNITED STATES

RE WINSHIP, 397 U.S. 358.

18 U.S.C SECTION 241: DEPRIVATION OF RIGHTS UNDER COLOR OF LAW

ADMINISTRATIVE CODE SS 26-521 [LEGAL RIGHTS TO PROPERTY]

UNIVERSAL CITATION: REAL PROP L SS 235-F [RIGHTS OF TENANTS WITHOUT CONSENT OF PROPERTY MANAGEMENT]

# S 35.15 JUSTIFICATION; USE OF PHYSICAL FORCE IN DEFENSE OF A PERSON.

"A PERSON MAY, SUBJECT TO THE PROVISIONS OF SUBDIVISION TWO, USE PHYSICAL FORCE UPON ANOTHER PERSON WHEN AND TO THE EXTENT HE OR SHE REASONABLY BELIEVES SUCH TO BE NECESSARY TO DEFEND HIMSELF, HERSELF OR A THIRD PERSON FROM WHAT HE OR SHE REASONABLY BELIEVES TO BE THE USE OR IMMINENT USE OF UNLAWFUL PHYSICAL FORCE... EVEN IN SUCH CASE, HOWEVER, THE ACTOR MAY NOT USE DEADLY PHYSICAL FORCE IF HE OR SHE KNOWS THAT WITH COMPLETE PERSONAL SAFETY, TO ONESELF AND OTHERS HE OR SHE MAY AVOID THE NECESSITY OF SO DOING BY RETREATING; EXCEPT THAT THE ACTOR IS UNDER NO DUTY TO RETREAT IF HE OR SHE IS:
(I) IN HIS OR HER DWELLING AND NOT THE INITIAL AGGRESSOR"

"IF A PERSON IS ATTACKED, AND THAT PERSON REASONABLY BELIEVES THAT HE IS IN IMMEDIATE DANGER OF DEATH OR GRIEVOUS BODILY INJURY, HE HAS NO DUTY TO RETREAT AND MAY STAND HIS GROUND AND, IF HE KILLS HIS ATTACKER, HE HAS NOT EXCEEDED THE BOUNDS OF LAWFUL SELF-DEFENSE."
BROWN V. UNITED STATES, 256 U.S. 335 (1921)

# 18 U.S.C SECTION 241: DEPRIVATION OF RIGHTS UNDER COLOR OF LAW

"WHOEVER, UNDER COLOR OF ANY LAW, STATUTE, ORDINANCE, REGULATION, OR CUSTOM, WILLFULLY SUBJECTS ANY PERSON IN ANY STATE... TO THE DEPRIVATION OF ANY RIGHTS, PRIVILEGES, OR IMMUNITIES SECURED OR PROTECTED BY THE CONSTITUTION OR LAWS... SHALL BE FINED UNDER THIS TITLE OR IMPRISONED... NOT MORE THAN ONE YEAR, OR BOTH; AND IF BODILY INJURY RESULTS FROM THE ACTS COMMITTED IN VIOLATION OF THIS SECTION... SHALL BE FINED UNDER THIS TITLE OR IMPRISONED NOT MORE THAN TEN YEARS, OR BOTH... IF SUCH ACTS INCLUDE KIDNAPPING OR AN ATTEMPT TO KIDNAP... SHALL BE FINED UNDER THIS TITLE, OR IMPRISONED FOR ANY TERM OF YEARS OR FOR LIFE, OR BOTH, OR MAY BE SENTENCED TO DEATH."

THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT EVERY ELEMENT OF A CHARGED OFFENSE. IN RE WINSHIP, 397 U. S. 358.

# NEW YORK LAW GIVES TENANT RIGHTS TO RESIDENTS OF 30 DAYS OR MORE

**Illegal Eviction Law**

NYC Administrative Code § 26-521. Unlawful Eviction.

"It shall be unlawful for any person to evict or attempt to evict an occupant of a dwelling unit who has lawfully occupied the dwelling unit for thirty consecutive days or longer"

## Single Lease Holders have the Right to Have an Additional Tenant without permission of landlord

**Universal Citation: NY Real Prop L § 235-F**

235-f. Unlawful restrictions on occupancy. 1. As used in this section, the terms:

" "Occupant" means a person, other than a tenant or a member of a tenant's immediate family, occupying a premises with the consent of the tenant or tenants.

2. It shall be unlawful for a landlord to restrict occupancy of residential premises, by express lease terms or otherwise, to a tenant or tenants or to such tenants and immediate family. Any such restriction in a lease or rental agreement entered into or renewed before or after the effective date of this section shall be unenforceable as against public policy.

3. Any lease or rental agreement for residential premises entered into by one tenant shall be construed to permit occupancy by the tenant, immediate family of the tenant, one additional occupant, and dependent children of the occupant provided that the tenant or the tenant's spouse occupies the premises as his primary residence.

4. Any lease or rental agreement for residential premises entered into by two or more tenants shall be construed to permit occupancy by tenants, immediate family of tenants, occupants and dependent children of occupants; provided that the total number of tenants and occupants, excluding occupants' dependent children, does not exceed the number of tenants specified in the current lease or rental agreement, and that at least one tenant or a tenants' spouse occupies the premises as his primary residence.

5. The tenant shall inform the landlord of the name of any occupant within thirty days following the commencement of occupancy by such person or within thirty days following a request by the landlord."

# Exhibit B

440.10 Motion to Vacate Charge

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF Manhatten____, TERM PART __21___

————————————————————————X

THE PEOPLE OF THE STATE OF NEW YORK     :

      Plaintiff,     :NOTICE OF MOTION
             TO VACATE JUDGEMENT
             CPL.440.10

   -against-      :
            IND.__02536-12___
            NYSID:.11560228R

Mitchell Taebel       :
      Defendant.   :

————————————————————————X

SIRS:

  Please take notice, that the annexed affidavit of _Mitxhell Taebel_ defendant, Pro-Se, duly sworn on to this _21_ day of __August_____, 20_13_, (and documents attached thereto) and upon the accusatory instrument and all the proceedings heretofore had herein, a motion will be made in the courthouse located at 111 Centre, st. court of Manhatten County, part (21) thereof, at the courthouse located at 111 Centre, on the _9_ day of _Sept_, 20_13_, at _9:30_ o'clock in the forenoon or as soon thereafter as counsel can be heard, for an order setting aside the sentence heretofore imposed upon the named defendant;

Or in the alternative, for an order for a hearing to determine whether such sentence should be set aside, and for such other and further relief as this court may deem just and proper.

Dated: _8/21/13_____

          Respectfully submitted,

          _____

          Mitchell Taebel
          Pro-Se Defendent

To: _Cyrus Vance Jr._____
  District Attorney
  County of _New York___

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF MANHATTEN, TERM PART @ 21

THE PEOPLE OF THE STATE OF NEW YORK

                                      AFFIDAVIT IN SUPPORT
                                      OF MOTION TO VACATE
                                      JUDGMENT

           _AGAINST_

                                       INDICTMENT #02536-12

Mitchell Taebel,
Defendant


I, Mitchell Taebel, being duly sworn, deposes and says that:
I am the aforementioned defendant, and make this affidavit in
support of a motion to vacate the judgment upon the grounds that
there is insufficient evidence.♂ The judgment should be vacated
under the provisions of NY Crim Proc Law 440.10.

That on or about the 10th day of May, 2013, I was sentenced to
a term of 6 months incarceration and 6 years probation on the
crimes of Penal Law 120.05/110 after a Pro Se Jury Trial.

The Felony charge of assault with intent for serious injury
pc120.05 and the misdeminor pc 110 must be vacated under law
due to insufficient evidence. Aside from any due process viol-
ations, a pro seᴓ defendant without prior experience is naturally
at a significant disadvantage against the prosecution. Under
these cercumstances it is understandable that a trial could
yield inacurate findings. In review of all the evidense including
the testimonies given at trial, it is clearly indicative that
the injury to the complaining witness was the resault of a legal
use of force. Infact, the only indication that the defendent
did anything but throw a single punch in self defense, is a test-
imony from someone who has been proven not to be a credible wit-
ness. This affidavit will enlighten some of the incoherent claims
made by the complaining witness in his false testimony AND DEMONS
TRATE how they relate to statewments made by Ms. Weinbum, the
injury itself, the defendent, and physical evidense brought forth
by the defense indicating the defendent acted lawfully. thus
reasoning the obligation to vacate the verdicts under law.

In the file given to the defense by the prosecution, contained a
page of notes which indicated Ms. Weinbum had made a statement
that she didn't see anyone punch anyone but she saw the complain-
ing witness and the defendent gob into the elevator. This contra-
dicts the complaining witness;s story and it supports the testim-
ony given by the defendent. In order to appear justified in his
actions, the complaining witness has omitted his initial use of
force against the defendent and described an incident taking
place entirely outside of the elevator. He claims to have only

placed a hand between the elevator doors before the defendant
ruthlesly, savagely, without reason, struck him twice and then
twice more. This is illegitimate and clearly contradicted by
Weinbum's initial statement. In court however, Weinbum changed
her story in order to avoid making a clear contradiction to the
testimony already given by the complaining witness, she said
she turned around and didn't see anything. Whether she turned
around or not, if the incident that the complaining witness
described actually accured, she would certaily have seen some
of it.

In the far-fetched story the complaining witness gave, he descr-
ibed being punched four times, however this is not supported
by6  the injury itself. For this part of his testimony to eve3n
make sense, he would have had to been punched four times in the
exact same spot. This would be extreamily difficult for even a
skilled boxer or martial artist, especially when someone is stan-
ding and moving around as he described. If someone with the cap-
ability to make that possible, was in that position, common
sense and common orthodox would reason them to aim somewhere
that's more effective and safer for the hand; for instance: nose,
jaw, throat, or solar plexus. The complaining witness's injury
especially on a 300 pound man, was in a very dangerous place
for someone to aim. If the defendents point of contact had been
slightly in any direction, especially higher to the forehead,
he could have easily broken his hand. This claim alone is far to
pecular to go without serious question.

The defendent has been described to have acted as a criminal, a
maniac, a barbaric monster who made a violent attack withought
thought or reason. This claim against the defendent's character
is absurd. This does not reflect a person who has no history of
violence. It does not reflect6 someone who comes from a succesful
family and is college edjucated.  It does not reflect someone who
hasa traveled all across the country and literally around the
world. It does not reflect someone who's longest full time job
was assisting the elderly and handicapt to and from work and
hospitals. It does not reflect someone who works in New York and
Los Angeles as an Actor, and who aspires to be in politics.
What it does reflect, is a fabricated story by a complaining
witness who seeks to mask his own fault. Someone who overstepped
his professional authority and used illegal physical force. As
one thing led to another, the defendent was struck in the face by
an increasingly agressive man. The defendent had every right to
stand his ground and defend himself.

The physical evidense brought forth by the defense related more
to the trespass charge which was dismissed. However, it also
proved the complaining witness had made some very significant
false statements in his testimony. Essentially he pretended he
had seen the defendent for the first time, only a few weeks befor
and didn't know he lived in the building. The evidense proved
the defendent had been living there for almost four months. The
complaining witness was also proven to be lying about the timing
of a previous minor incedent with the defendent by about three

months. These false statements demonstrate malicious intent and the lack of credibility of the witness.

In review of all the evidence including the testimonies, it is clearly indicative that the defendent used lawful physical force in self defense. In accordance with law the jury verdicts on pc 120.05/110 must be vacated due to insufficient evidence. You yourself mentioned several times throughout the trial, your doubt of sufficient evidense, especially on the felony charge. The jury may have been pursuaded by the prosecution but the prosecutors arguements have been proven to be based on a fabricated testimony. There is no evidense that the defendent is guilty of assault or intent for serious injury, therefore both charges must be vacated.

Respectfully Submitted

Mitchell Taebel

Sworn to before me this
23rd day of August, 2013.

NOTARY PUBLIC
TYPHANIE LYNCH
Notary Public - State of New York
No.01LY6156399
Qualified in Kings County
My Commission Expires Nov. 27,

AFFIDAVIT OF SERVICE

STATE OF NEW YORK)
                              ss:
COUNTY OF MANHATTEN)

Mitchell Taebel, being duly sworn, deposes and says:

That I have on this 21st day of August, 2013 placed and submitted in the postal receptacle in the New York Correctional Facility known as the Eric M. Taylor Center, 10-10 Hazen st East Elmhurst New York, NY 11370 a Notice of Motion to Vacate Judgement, CPL 44 0.10, to be duly mailed via the united states Postal Service to the following parties in the above action:

District Attorney's Office
Newy York County Manhatten
1 Hogan Place Rm 854
New York, Ny 10013

Motion Clerk
Supreme Court
21st department
27 Madison ave
New York, Ny 10010

Supreme Court
Criminal Part 21
111 Centre st
New York, Ny 10013

Respectfully Submittede,

Mitchell Taebel

Sworn to before me this
23rd day of August, 2013

NOTARY PUBLIC
TYPHANIE LYNCH
Notary Public - State of New York
No.01LY6156399
Qualified in Kings County
My Commission Expires Nov. 27, 2015

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: TERM PART 21
------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                 -against-

MITCHELL TAEBEL,
                Defendant.
------------------------------------------------------------X

**SUPPLEMENATL AFFIDAVIT
IN SUPPORT OF MOTION TO
VACATE JUDGEMENT CPL 440.10**

IND. 2536-2012

STATE OF NEW YORK   )
                        S.S.:
COUNTY OF NEW YORK )

     I, MITCHELL TAEBEL, being duly sworn, depose and say that: I am the aforementioned defendant, and make this supplemental affidavit in support of the motion to vacate judgment pursuant Criminal Procedure Law 440.10 on grounds of Insufficient Evidence and Violations of Due Process.

     The motion to vacate judgment and supporting affidavit was recently submitted on August 23rd while the defendant did not have access to the physical transcripts and evidence at hand, thus reasoning the submission of a supplemental affidavit with direct reference to the testimonies and statements made at trial.

     Annexed hereto as Exhibit "A" are the relevant portions of the trial transcripts cited. Due to the volume of the transcripts, only the salient pages are included.

     The defendant respectfully requests an order setting aside the verdict for both charges, the termination of the probationary sentence, and any other relief the court finds just and proper.

## I.    **Legally Insufficient Evidence**

### A.  Guilty Verdicts Rest On False Testimony

     The guilty verdicts are founded solely on a fabricated testimony from a proven to be, incredible Complaining Witness. The defendant's testimony which is

supported by the weight of the evidence, indicates he was justifies in his use of force as described under Penal Law 35.15. There are inherent contradictions in the statements made by the complaining witness and the testimony is contradicted by physical evidence and the testimonies of Ms. Weinbum and the Defendant.

### 1.   Inherent Contradictions

The complaining witness, under direct examination discussing the first time he had seen the defendant:
Q. When was the first time you saw him at all, not talked to him, but saw him as you described?
A. In April -- I am sorry, in August, sometime in August. (37:10-12)

The complaining witness's coy response "In April – I am sorry, in August" Meets the requirements of the *Ledwon* rule, which states, an inherently contradicting testimony that points to both guilt and innocence, alone, cannot provide grounds to establish guilt beyond a reasonable doubt (see *People v Ledwon*, 153 NY 10, 17, 18 [1897]). Furthermore, under cross-examination, the witness made more substantial contradictions regarding the first time he had seen the defendant. As he sensed the defense about to make an argument against him, he suddenly began to change his story, contradicting his statement above;

DEFENDANT:  So, once again, you claim the first time you saw me was when?
WITNESS: Sometime in August.
DEFENDANT: Sometime in August. Wow.
WITNESS:  Wait, let me clarify that, not the first time I had seen you. The first time I had seen you I can't remember. The only time I had seen you—
DEFENDANT: oh?
THE COURT: Mr. Taebel, quit the comments, okay. The jury is directed to disregard them. Let the witness answer the question. You asked him when the first time was he saw you. Keep quiet till the question is answered.
THE WITNESS: I had seen the gentleman leaving with Raquel Toro on other occasions.
THE COURT: Before the beginning of August?
THE WITNESS: Yes, Your Honor. (69:9-25)

THE COURT: Well no. Lets first clarify what we are talking about. When is the first time you think you saw Mr. Taebel?

> THE WITNESS: The first time? I honestly don't remember, your honor. I couldn't say.
> THE COURT: And you have no clue as to whether it was, it was some point before August?
> THE WITNESS: Yes.
> THE COURT: And you don't remember if it was April, May, June, July?
> THE WITNESS: Honestly, Your Honor, I do not.
> THE COURT: Do you know if it was sometime in 2011 or before that?
> THE WITNESS: I would say it was in 2011 probably. (73:12 to 74:1)

Under cross-examination, the witness for the first time claimed he couldn't recall, when he had first seen the defendant and whether for certain it was even in the year of 2011. Prior to this sudden change in his testimony, he had already clearly stated three times, under oath, that the first time he had ever seen the defendant was only a few weeks prior in August. The first time was to the grand Jury (8:8), second, under direct examination (37:12) and the third, under cross-examination (69:11).


To the Grand Jury,
Q. How do you know that person?
A. He came to be known as the boyfriend of our tenant Raquel Toro.
Q. Approximately, when did you first meet this person?
A. Sometime in August.
Q. Of?
A. 2011.
Q. How did you meet him?
A. I had seen him with the tenant when they would leave in the mornings. (8:3-13)

When the doorman, saw the defendant in the building for the first time, is clearly relevant because it would imply, either guilt or innocence of the trespass charge; and it would reveal, whether the doorman could have believed, there was any reason or authority to prevent the defendant from entering the building. Under the Ledwon Rule, this testimony cannot establish grounds for proof beyond a reasonable doubt.


## 2.  Conflicts Between Witnesses

The only other witnesses of the incident, were Ms. Weinbum(the building manager) and the Defendant. Her testimony is unmistakably more supportive of the

testimony given by the Defendant. In the complaining witness's testimony, he describes being punched four times in the corridor, never entering the elevator, and never attempting to physically block the defendant; all of which are false claims and contradicted by the testimonies of both the defendant and Ms. Weinbum.

Ms. Weinbum under direct examination,

Q. So just what you actually saw.
A. Yeah, Mr. Martoni ran after the Defendant.
Q. And what happened at that point?
A. The Defendant kept going towards the elevator and Frank basically put his arms at his sides preventing.
THE COURT: I'm sorry, whose arms at whose side?
THE WITNESS: Frank Martoni put his arms out.
THE COURT: His own arms?
THE WITNESS: Yes, like this, against the elevator so the defendant would not go in the  elevator.
Q. Where was the defendant when Frank was positioned? And just for the record you are extending your arms slightly lower than your shoulders, out to the side?
A. Correct. The defendant was facing him at that time.
Q. And where were you when this –
A. I was at the door. I was -- there was nobody at the door and people were kind of coming in. looked like they were coming in, so I stayed there and then I turned around and I no longer saw Mr. Martoni and the defendant.
Q. So when you say you turned around, which way were you facing?
A. I was facing the door. (135:22 to136: 18)

Q. And when you turned around, what did you see?
A. Well I didn't see either person. I kind of made the assumption that they were –
THE COURT: Lets not talk about the assumptions that you made.
THE WITNESS: Okay.
Q. You didn't see –
A. I didn't see anyone, no.
Q. Did you come to see either of those people again?
A. I did. I saw frank come out of the elevator holding his left eye. (137:3-13)

Q. From that perspective you had, could you actually see the elevator door open?
A. Yes I did. I was a little bit this way.
Q. Could you see inside the elevator?
A. No. (138:16-20)

The Defendant's description of the incident is very consistent with the testimony given by Ms. Weinbum. They clearly correspond on three things that contradict the testimony given by the complaining witness: (1) They do not indicate the complaining witness was punched four times in the corridor. (2) They do not indicate. he and the defendant remained outside of the elevator. (3) They both say the complaining witness raised his arms attempting to physically stop the defendant from entering the elevator. Defendant's testimony,

> Q. But you thought he was chasing you?
> A. Yes, he was pursuing me correct. (181:2-3)
>
> THE COURT: So Mr. Taebel, from what I understand of your testimony, Mr. Martoni got in front of you and using his body and arms out to the sides attempted to block you from entering into the elevator.
> DEFENDANT: Correct.
> THE COURT: Okay. And at that point he didn't physically touch you, he inserted himself in front of you, correct?
> DEFENDANT: Yeah, but I'd say we kind of collided as he stepped in front of me so—
> Q. So you wouldn't say that you pushed him in, you would say that you collided and then went into the elevator together?
> A. Right. He was stepping backwards, as we collided, he stepped backwards into the elevator. (185:20 to 186:9)

Again, the complaining witness's testimony contradicts the three clear uniformities between the defendant and Ms. Weinbum: (1) They do not indicate the complaining witness was punched four times in the corridor. (2) They do not indicate the complainant and the defendant remained outside of the elevator. (3) They both say the complaining witness raised his arms in an attempt to physically stop the defendant.

Complaining Witness's made-up version of the incident,

> Direct Examination:
> A. I am backing up. The two elevators on the left we call elevator one, elevator two, the one on the right is elevator three. Elevator three opens up. I turn to go towards elevator three. As I am Walking I hear what's your fucking problem, Frank, and I received two shots to my left temple.
> Q. And just for the record, you are indicating on the left side of your face just next to your eye?
> A. Yes, sir, I am.
> Q. Please continue.
> A. I was staggered and I grabbed hold, if this is the entrance to the elevator I grabbed hold of it and pulled myself out. As I am coming out I once again hear what is your fucking problem, Frank. I received to more shots to the

same spot, which puts me on the other side of the hall or corridor, if you prefer. Where elevator one and two are. As I turned to my left I see Mr. Taebel in elevator three and the door closes.

Q. Back up to when the defendant first entered the building. Why did you tell him that he needed to be announced that day if you had had that prior contact with him and he had a permission form?

A. Because I knew the permission slip had been removed.

Q. And who removed it?

A. I had.

Q. Now, when you were going toward the elevator, what was your intention in going to the elevator? What were you planning to do?

A. To stick my foot because the elevator door has a sensor will which will not allow it to close if something is blocking the way.

Q. When you received the first two blows, can you tell the jury what you felt at that time?

A. You are stunned, basically. I didn't know what had happened to me. I just grabbed something because I could feel myself falling. I pulled myself out, you know. I didn't want to fall down, I didn't want to fall into the elevator. And I came out and again I heard what is your fucking problem. I never saw where he was, I just heard him in my left ear and that is when I received two more shots to the left side of my head.

Q. When you were walking in the corridor toward the elevators, were there any other people in that area?

A. No, sir. Nobody was there.

Q. And the voice that you heard say the things that you indicated, did you recognize that voice?

A. Yes, sir, I did.

Q. And whose voice did you recognize it to be?

A. Mitchell Taebel, the same one who had spoken to me at the front desk.

Q. So, again, those first blows that you described, What ,
if any, pain did you feel to that area of your face where you describe the hitting?

A. It was throbbing and he had opened up a cut above my left eyebrow and the blood was just dripping down my face.

Q. Again indicating with your left hand your left eyebrow area?

A. Yes, Sir.

Q. Now, the second two blows, what if any pain did you feel from those blows?

A. How can I describe it? You are – it is fuzzy. You are numb, you know. You want to do something but it is just not happening at the speed that it normally would. That is the only way I know how to describe it. You know, you want to walk and it is more effort. Kind of feel, your feet kind of feel numb. That is how it was for me. (39:7 to 41:20)

Cross-Examination:

THE DEFENDANT: Okay Mr. Martoni, you said you were struck four times in the exact same spot, is that correct?
THE WITNESS: On the left side of my temple.
THE DEFENDANT: You sure it wasn't just once?
THE WITNESS: I heard four cracks.
THE DEFENDANT: You heard four cracks. Okay. Also you said that you were not in the elevator all the way, is that correct?
THE WITNESS: I wasn't in the elevator all the way, no. I was knocked partially into the elevator. I grabbed ahold before I was falling in.
THE DEFENDANT: Even though Ms. Weinbum's statement says –
Mr. ROONEY: Objection, Objection. (62:20 to 63:7)

These statements from the Complaining witness reveal a number of issues in his testimony:

1.      They clearly contradict the consistencies between the other two testimonies. The complaining witness does not describe himself pursuing the witness, he describes himself backing up. He then describes himself turning towards the elevator and hearing the defendant before being struck twice as he is walking. However, both the defendant and Ms. Weinbum clearly stated they saw him with his arms raised, attempting to block the defendant's path to the elevator. He denies this entirely. He describes a situation where he never used physical force to stop the defendant, he claims to have been sucker punched without even being able to see the defendant; "I never saw where he was, I just heard him in my left ear" (40:18-19). He claims not being able to see the Defendant because it makes his fabricated story easier to tell. He clearly denies that he or the defendant was ever entirely inside the elevator during the altercation. He denies being in there, because that is where he lost his temper and proceeded to make an attack against the defendant, slamming him against the wall repeatedly and hitting him in the face in the process. The other two witnesses contradict these claims and under examination they are undoubtedly, incoherent and intended deceive. .

2.      The complaining witness confirms under cross-examination that he is claiming to have been struck four times in the exact same spot (argument against the probability of that is in the initial affidavit). When asked by the defendant, "are you sure it wasn't just once?" Instead of simple saying yes or no, he averted, and said, "I heard four cracks" an indication of feebleness.

3.      In the complaining witness's fantasy story, where he is the innocent victim, he claims the "second two punches", put him on the other side of the hall. How would two additional punches to the same spot, suddenly sent him across the hallway, in the opposite direct of the first two punches? Unless the second two came from 180 degrees in the opposite direction of the first two and he himself had made 180 degree turn, it wouldn't make sense.

4.      Despite the description given by the prosecution of the video footage, and the narration by the complaining witness during playback before the jury, the video better serves the defense.  The complaining witness described picking up a radio before the incident, but it appears more as if he was setting it down. If he had set the radio down at that point, it would clearly indicate his intent to use force and the need to have two free hands. After the altercation, the video shows him returning to the post carrying his hat in his right hand and there does not appear to be a radio in his left hand. This would also explain why the defendant didn't recall seeing a radio.  Mr. ROONEY: He had a radio in his hands right? DEFENDANT: No. (189:3-4). The body language of the complaining witness also suggests intent to use force and he clearly steps in behind the defendant while speaking to Ms. Weinbum. He also makes an uncommitted attempt to block the defendant while still on camera but the defendant was able to walk past. The complaining witness then pursues.

5.      In no way can he justify an attempt to bar the Defendant from the building when the Defendant had been living there since early May and visiting the building on a regular basis since March (almost six months prior to the incident).

6.      He is fabricating because he, now knows, that any use of physical force was illegal under laws and principals much bigger than any building policies which he's pretending to have been enforcing; and when asked what his management company instructs him to do in the event he would need to enforce those policies, he said, "I would call my superintendent first. We are not allowed to physically touch anybody."(85:2-3). This incident never should have happened, and it only happened because the doorman was abusing the minor authorities of his position.

7.      Furthermore the complainant refuses to admit any wrongdoing or the absurdity of questioning someone for a permission slip and imposing himself when they've been living in the building. When asked by the defendant if he could understand how someone might find his excessively authoritative and assertiveness offensive and "rude", he asked the defendant to repeat the question. Then as he attempted to divert, the Court insisted he answer the question,

> THE COURT: NO, sir, answer his question. If someone lived in the building and you challenged them, do you understand why they might consider that rude?
> THE WITNESS: No, sir (68:8-11).

In such an instance where the witness is deemed to be "incredible or unreliable as a matter of law" (*People v Calabria*, 3 NY3d at 82), the conviction must be vacated because "the jury is left without any basis, other than impermissible speculation, for its determination of" guilt (*People v Jackson*, 65 NY2d at 272); *see also People v Fratello*, 92 NY2d 565, 573 [1998])

**C.**  Intent for Serious Injury Has Not Been Indicated

Because this case involves justified physical force in defense of a person as described under Penal Law 35.15, the burden for the prosecution is to prove beyond a reasonable doubt that the defendant was not lawfully justified. Speculation of the severity of the injury is of little relevance to the determination of guilt or innocence in this case. Nevertheless, its worth noting that the injury did not meet the legal definition of serious injury and there is certainly no basis to argue the defendant intended to cause greater injury. The Felony charge in this case, is entirely unreasonable and unsupported in every way. Additionally, The Court expressed its doubt of sufficient evidence for the felony charge three times: The first, after the prosecution rested their case (142:17-21). The second, just before closing arguments (208:8-17). The third, following the jury's verdict (286:6-8).

I.     **Violations of Due Process**

    **A.** Abuse of Discretion

The court's demeanor was detrimental to the defendant's right of due process. As a pro-se defendant the defense was especially susceptible to the court's guidance.  The judge appeared biased against the defendant for representing himself. Had the courts intent been devoted to the Interest of Justice, the defendant could not have been convicted. The intervention of the Judge was clearly excessive and harmful to the defense. The court did not have a proper demeanor and the defendant was deprived the right to a fair trial.

The defendant's main argument has continued to focus on the complaining witness's testimony, which he knows is false, better than anyone because he was there and he has continued to undergo the effects of these fabrications since the incident occurred. This fabricated testimony is the bases for all the charges, not the injury. The complaining witness and the prosecution have continuously used details of the injury as a distractive argument. The issue the jury should have been deliberating was whether the complainant was providing a reliable testimony and if the weight of evidence supported or contradicted his version of the story.

While endeavoring to enlighten the jury of the incongruities in the complaining witness's testimonies, the court continued to interrupt and defuse the defendant's arguments during the cross-examination. This occurred as the defense began to ask about the contradictions to Ms. Weinbum's statements (63:1 to 64:20). Then as the defense motioned to submit an image of a text message sent to Ms. Toro by the defendant, (which contained the doorman's name and was dated May 24th), the judge denied the evidence and its use in the cross-examination (68:19-23). When the defense asked about the variances in the statements regarding the first time he had seen the defendant, the court interrupted and called for a sidebar meeting, then shortly after, another side bar meeting; this pattern of interruption continued throughout the remainder of the cross-examination (69:22 to89:5).

Afterwards the defense asked to have the witness impeached but the judge refused to acknowledge the arguments and evidence against him:

> THE DEFENDANT: I'd like to have the witness impeached. He's obviously lied and - -
> THE COURT: Sir, the comment is stricken and the jury is directed to disregard it.
> Do you have something else you wish to impeach the witness with other than you disagreeing with his testimony? We understand - - well, I am going to withdraw that. (88:18-25)

This occurred after the defense had presented the prosecutor's notes where Ms. Weinbum's statements made a clear contradiction to the testimony of the complainant. The judge had even insisted the notes be show to the prosecution, who in turn showed the witness prior to questioning (63:17-19). The contradictions had already been demonstrated but when the defense attempted to clarify this for the jury, the judge suddenly batted it down and directed the jury to disregard it:

> THE DEFENDANT: You say you were never in the elevator, she says you were in the elevator?
> Mr. ROONEY: Objection.
> THE COURT: Sustained. The portion about Ms. Weinbum saying that Mr. Martoni was in the elevator is not evidence in this case, it is stricken, the jury is directed to disregard. (65:15-21)

The second main argument the defense made for the impeachment of the witness was regarding the inherent inconsistencies in which he claimed to have first seen the defendant. Before stating that he couldn't recall the first time he had seen the defendant,

> THE COURT: And you don't remember if it was April, May, June or July?
> THE WITNESS: Honestly, Your Honor, I do not.
> THE COURT: Do you know if it was sometime in 2011 or before that?
> THE WITNESS: I would say it was in 2011 probably. (73:21 to 74:1)

He had already stated at least three times previous, that the first time he had seen the defendant was a few weeks prior to the incident in August. The inherent contradictions in his testimony should have been grounds for impeachment. The

Defense attempted to make this contradiction clear for everyone by referring to the transcripts of his grand jury testimony, which the defense had a printed copy of, with the contradicting statement highlighted. It should have been a very clear and easy point made but then the judge intervened, hijacked and sabotaged the cross-examination. Despite all this, the point had still been made that there were significant inconsistences regarding the complainants statements about the first time he had seen the defendant. However, the Court ultimately disregarded the defenses movement to impeach and inferred that there wasn't evidence for impeachment. (88:18-25)

It appears the Court denied evidence that should have gone in and misinformed the defense; indicating, none of the evidence could go in until the defendant testified. All evidence brought forth by the defense was projected to disprove the claims of the complaining witness. It should have been submitted and used in the cross-examination so the jury could see the witness being questioned with the evidence against his testimony. The defense intended to use all the evidence during the cross-examination. The court knew the defendant's intent was to impeach the witness because the defense had stated that previously. The Court denied the majority of the evidence, which included: a text message with the complaining witness's name dated may 24th, a signed and notarized letter from Raquel Toro discussing the defendants move in date and that she had notified the office manager that the defendant would be staying indefinitely, prosecutor's notes, pay-pal statements with mail orders to that address, defendants tax returns mailed to that address, sports club application addressed to the residence, and credit card statements. The complaining witness who tried to pretend that the defendant didn't live in the building or that he didn't know the defendant lived in the building was contradicted by an overwhelming amount of evidence however, the Judge denied all of its use for the impeachment during cross-examination. The only evidence that went in was the credit card statements and sports club application and it wasn't until the defendant later testified. The conduct of the Court, especially during the cross-examination, was ludicrous and an abuse of discretion.

### B. Prosecutorial Misconduct

Reversal is mandated when the prosecutor has caused such substantial prejudice to the defendant that he has been denied due process of law. In measuring whether substantial prejudice has occurred, one must look at the severity and frequency of the conduct, whether the court took appropriate action to dilute the effect of that conduct, and whether review of the evidence indicates that without the conduct the same result would undoubtedly have been reached. *People v Mott*, 94 AD2d 415, 419 [1983]; *also see People v. Morrice, 61 A.D. 3d 1390, 1392 [2009].*

1. The prosecution failed to adhere to Criminal Procedure law 240.45 regarding discovery upon trial. The prosecution at trial must turn over to the defense all statements of a prosecution witness relating to the witness's trial testimony *(se,e People v Rosario* 9, NY2d 286, 213 NYS2d 448). The failure to do so constitutes per se error requiring that the conviction be reversed and a new trial ordered *(see, People v Perez*, 65 N.Y.2d 154, 159-160, *supra).*

*2.* The prosecution violated the C.P.L. 30.30 speedy trial time limitations and the Speedy Trial Clause under the fourteenth amendment (*United States v. Shell,* 974 F.2d 1035 [9th Cir. 1992]).

3. There were five additional arguments on the prosecutor's misconduct, which were all described and supported in detail in the 330. Included arguments were: the prosecutor characterized the defendant as a liar, the prosecutor vouched for the credibility of the complainant, the prosecutor attempted to shift the burden of proof, the prosecutor referred to facts not in evidence, and the prosecutor drew inflammatory conclusions.

### C. Ineffective Assistance of Counsel

There was also an issue of ineffective counsel, which contributed to the pro-se trial. Prior to trial the defendant had requested new counsel but the request was denied. During trial the court also refused to assign new counsel. The counsel assigned failed to provide useful advice including requesting Rosario material, relevant motions, and relevant rules of evidence. Before trial, when the judge was asked what the defendant's pre-trial motion was, he motioned for dismissal but then before he was able to discuss grounds for the dismissal, Michelle Hauser (assigned cousel) interrupted and said it needed to go to trial. The first argument for dismissal was going to be the speedy trial violation.

### Conclusion

For the foregoing reasons, the Defendant's Motion should be granted in it's entirety.

Dated: New York, New York
         September 22nd, 2013

                                              Sincerely,

                                              Mitchell Taebel
                                              2020 Golden Gate Dr.
                                              Long Beach, In 46360
                                              MitchTaebel@gmail.com
To: Cyrus R. Vance, Jr.                        (219) 871-9627
     One Hogan Place
     NEW YORK, NY 10013

# Exhibit "A"

Martoni - direct - People                        page 37

1    *Q*    2011?

2    *A*    Yes, sir.

3    *Q*    Had you seen Mr. Taebel before that brief interaction

4   with him?

5    *A*    Yes, I have.

6    *Q*    Describe the circumstances under which you had seen him

7   before?

8    *A*    Sometimes I would see him leave in the mornings with

9   Raquel Toro.

10   *Q*    When was the first time that you saw him at all, not

11  talked to him, but saw him as you described?

12   *A*    In April -- I am sorry, in August, sometime in August.

13   *Q*    But you had seen him leave before you actually talked

14  to him and saw his permission form?

15   *A*    Yes, sir.

16   *Q*    Did you ever stop Mr. Taebel when he was with Ms. Toro?

17   *A*    No, sir.

18   *Q*    Why not?

19   *A*    He is with a tenant.

20   *Q*    Would you recognize Mr. Taebel if you saw him again?

21   *A*    Yes, sir.

22   *Q*    Take a second to look around the courtroom and tell me

23  if you see that person you know as Mr. Taebel in the courtroom

24  today?

25   *A*    The gentleman with the brown shirt and black tie.

1   myself which would be in front of Mr. Taebel as he was talking

2   to her.  He started to walk away, I backed up.  There is the

3   front of the building where my desk is, it is a lobby, it is a

4   big lobby like this and then you walk back a little ways and it

5   narrows down to a corridor.  In that corridor if you are facing

6   it there are two elevators on the right, I am sorry, two

7   elevators on the left and one on the right.  I am backing up.

8   The two elevators on the left we call elevator one, elevator

9   two, the one on the right is elevator three.  Elevator three

10  opens up.  I turn to go towards elevator three.  As I am walking

11  I hear what is your fucking problem, Frank, and I received two

12  shots to my left temple.

13      Q    And just for the record, you are indicating on the left

14  side of your face just next to your eye?

15      A    Yes, sir, I am.

16      Q    Please continue.

17      A    I was staggered and I grabbed hold, if this is the

18  entrance to the elevator I grabbed hold of it and pulled myself

19  out.  As I am coming out I once again hear what is your fucking

20  problem, Frank.  I received two more shots to the same spot,

21  which puts me on the other side of the hall or corridor, if you

22  prefer, where elevator one and elevator two are.  As I turned to

23  my left I see Mr. Taebel in elevator three and the door closes.

24      Q    Back up to when the defendant first entered the

25  building.  Why did you tell him that he needed to be announced

1   that day if you had had that prior contact with him and he had a

2   permission form?

3       A    Because I knew the permission slip had been removed.

4       Q    And who had removed it?

5       A    I had.

6       Q    Now, when you were going toward the elevator, what was

7   your intention in going to the elevator?  What were you planning

8   to do?

9       A    To stick my foot because the elevator door has a sensor

10   will which will not allow it to close if something is blocking

11   the way.

12       Q    When you received those first two blows, can you tell

13   the jury what you felt at that time?

14       A    You are stunned, basically.  I didn't know what had

15   happened to me.  I just grabbed something because I could feel

16   myself falling.  I pulled myself out, you know.  I didn't want

17   to fall down, I didn't want to fall into the elevator.  And I

18   came out and again I heard what is your fucking problem.  I

19   never saw where he was, I just heard him in my left ear and that

20   is when I received two more shots to the side of my head.

21       Q    When you were walking in the corridor toward the

22   elevators, were there any other people in that area?

23       A    No, sir, nobody was there.

24       Q    And the voice that you heard say the things that you

25   indicated, did you recognize that voice?

1    A    Yes, sir, I did.

2    Q    And whose voice did you recognize it to be?

3    A    Mitchell Taebel, the same one who had spoken to me at

4    the front desk.

5    Q    So, again, those first blows that you described, what,

6    if any, pain did you feel to that area of your face where you

7    describe the hitting?

8    A    It was throbbing and he had opened up a cut above my

9    left eyebrow and the blood was just dripping down my face.

10   Q    Again indicating with your left hand your left eyebrow

11   area?

12   A    Yes, sir.

13   Q    Now, the second two blows, what, if any, pain did you

14   feel from those blows?

15   A    How can I describe it?  You are -- it is fuzzy.  You

16   are numb, you know.  You want to do something but it is just not

17   happening at the speed that it normally would.  That is the only

18   way I know how to describe it.  You know, you want to walk and

19   it is more of an effort.  Kind of feel, your feet kind of feel

20   numb.  That is how it was to me.

21   Q    Mr. Martoni, did you strike the defendant at any point

22   on September 2, 2011?

23   A    No, sir.

24   Q    Did you touch him in any way?

25   A    No, sir.

Martoni - direct - People                    page 52

1   the physician that was on call, I saw an ENT doctor and I saw an

2   ophthalmologist.

3       Q   And what were you feeling while you were at the

4   hospital that day?

5       A   When I was there I started to feel a little dizzy now,

6   a little nauseous, still with the side of my head hurting.

7       Q   And what, if any, manifestation of that nauseous

8   feeling did you experience?

9       A   I threw up two times in the emergency room.

10      Q   And prior to receiving those blows, had you felt sick

11  to your stomach?

12      A   No, sir.

13      Q   What, if any, medication were you provided at Lenox

14  Hill Hospital that day?

15      A   I was given painkillers and anti-nausea medicine.

16      Q   Did you stay overnight in the hospital that day?

17      A   No, I did not.

18      Q   When you left the hospital that day, was it your

19  understanding that you would need additional medical attention?

20      A   Yes.  The ENT doctor said that I would need surgery

21  because I had orbital fractures to the side and on the floor of

22  the eye socket.  They usually had an ENT surgeon there, but that

23  night they did not.

24      Q   Did you ultimately have that surgery?

25      A   Yes, sir, I did.

Dawn M. Candella
Senior Court Reporter

Martoni - direct - People                              page 53

1    Q     Now, on the next day, September 3, 2011, did you go to
2    work?

3    A     No, sir, I did not.

4    Q     Why not?

5    A     I couldn't till I had my surgery and on doctor's
6    orders, you know, to stay home.

7    Q     And what, if any, limitations did you have during this
8    period immediately following September 2nd?

9    A     Besides not going to work, no exertion, pretty much
10   just bed rest, no sudden turns, not to lean over too fast, and
11   the thing that bothered me the most was I was not allowed to
12   sneeze through my nose and I could not blow my nose because the
13   fractures are right above my sinus.

14   Q     How, if at all, did your injuries affect what you are
15   able to eat?

16   A     Only soft foods.

17   Q     For how long?

18   A     Pretty much till I went back to work.

19   Q     Which was when?

20   A     I believe it was October 12th.

21   Q     How, if at all, did your injuries affect your sleep?

22   A     Sleep?  When you are at home you sleep during the day,
23   so at night you are up and down, but even after everything I
24   still would get maybe six hours sleep a night interrupted.

25   Q     And was that normal for you?

*Dawn M. Candella*
*Senior Court Reporter*

Martoni - direct - People                    page 54

1      A      No.

2      Q      What would your normal sleeping patterns be before?

3      A      About seven hours.

4      Q      Interrupted?

5      A      No, uninterrupted.

6      Q      You indicated that you ultimately received surgery, is

7   that right?

8      A      Yes, sir, I did.

9      Q      Where did you receive that surgery?

10     A      New York Presbyterian Hospital.

11             THE DEFENDANT:  Objection.  Is that leading?

12             THE COURT:  No.

13     Q      Can you describe the condition following the surgery

14   before you went to work, what kind of physical condition were

15   you in at that point?

16     A      Before?

17             THE COURT:  After the surgery.

18     Q      So first let me -- before surgery, if you can describe

19   your general physical condition?

20             THE COURT:  I think we have heard that already.

21             How long after September 2nd did you have the

22       surgery?

23             THE WITNESS:  I think it was the end of September.

24             THE COURT:  Why so long?

25             THE WITNESS:  Because they didn't have the ENT

1    surgeon.  I had to go through Workers' Comp and to find a

2    surgeon that does Workers' Comp, even if you go on the

3    computer what they have listed is not what is available.

4         Q    And following surgery, can you describe your general

5    physical condition before you went back to work?

6         A    Well, the doctor had done a good job.  He went in, they

7    were going to go along the bottom here but instead they went in

8    through the roof of my mouth and through my eyebrow.  They

9    installed titanium plates and screws which are permanently in

10   there.

11        Q    And how are you feeling physically following the

12   surgery before you went back to work?

13        A    Oh, it hurt.  This area became -- I got nervous because

14   this area was numb.

15        Q    You are indicating the left side right above of your

16   lip?

17        A    Right, the upper jaw.  But the doctor told me that

18   could take six months to go away and it did.

19        Q    It took six months to go away?

20        A    Approximately, yeah.

21        Q    What, if any, limitations to your activity were you

22   under following the surgery before you went back to work?

23        A    No heavy lifting till he was sure that everything was

24   fine and that he had removed the stitches.  There were internal

25   and external ones.

Martoni - cross - Defendant                     page 62

1            THE DEFENDANT:  No objection, Your Honor.

2            THE COURT:  People's Exhibits 13 and 14 will be

3     received in evidence.

4            MR. ROONEY:  14 and 15, Your Honor.

5            THE COURT:  Sorry, 14 and 15.

6            (HANDING)

7            THE COURT:  And, sir, just hospital names in New

8     York have been morphing a lot lately.  Just so I am clear,

9     New York Presbyterian is what we used to call Cornell Weill?

10           THE WITNESS:  On York Avenue and 68th Street.

11           THE COURT:  Not Columbia Presbyterian up on

12    Washington Heights?

13           THE WITNESS:  Correct, Your Honor.

14           MR. ROONEY:  Your Honor, I have no further

15    questions at this time.

16           THE COURT:  Thank you.

17           Cross examination.

18    CROSS EXAMINATION

19    BY THE DEFENDANT:

20       Q    Okay, Mr. Martoni, you said you were struck four times

21    in the exact same spot, is that correct?

22       A    On the left side of my temple.

23       Q    You sure it just wasn't once?

24       A    I heard four cracks.

25       Q    You heard four cracks.  Okay.

1    Also you said that you were not in the elevator all the way,

2    is that correct?

3        A    I wasn't in the elevator all the way, no.  I was

4    knocked partially into the elevator.  I grabbed a hold before I

5    was falling in.

6        Q    Even though Ms. Weinbaum's statement says --

7                MR. ROONEY:  Objection, objection.

8                THE COURT:  Well, there is an appropriate way to

9        do that.

10               Are you familiar with -- this is a written

11       statement Ms. Weinbaum made?

12               THE DEFENDANT:  Yes, Your Honor, it is a written

13       statement.

14               THE COURT:  Are you familiar with the written

15       statement that Ms. Weinbaum made?

16               THE WITNESS:  No, Your Honor.

17               THE COURT:  Show it to Mr. Martoni, have him take

18       a look at it and ask him after reviewing that whether that

19       refreshes his recollection as to --

20               MR. ROONEY:  Can you show it to me?

21               THE COURT:  I assume you have this.

22               MR. ROONEY:  I don't know what he is talking

23       about.

24               (SHOWING TO THE PEOPLE)

25               THE DEFENDANT:  Does that refresh --

1          MR. ROONEY:  It is not my recollection.

2          (HANDING TO THE WITNESS)

3    Q    Never saw anyone --

4          THE COURT:  Mr. Taebel, there is a right way and a

5    wrong way to do it and you are not doing it the right way.

6          Looking at that, have you ever seen that before?

7          THE WITNESS:  No, sir.

8          THE COURT:  Does that refresh your recollection as

9    to whether, as to where you were when you got struck or

10   whether you were --

11         What is the question, Mr. Taebel, whether he was

12   entirely in the elevator?

13         THE DEFENDANT:  Yes, correct.

14         THE COURT:  As to whether you were entirely in the

15   elevator?

16         THE WITNESS:  My recollection is I was not

17   entirely in the elevator.

18         THE COURT:  So that does not refresh your

19   recollection?

20         THE WITNESS:  No, Your Honor.

21         THE COURT:  Thank you.

22   Q    Would you agree that had you been outside the elevator,

23   Ms. Weinbaum would have seen everything --

24         MR. ROONEY:  Objection.

25   Q    -- that occurred?  It would have been in clear sight of

Martoni - cross - Defendant                    page 65

1   where she was standing, correct?

2                   MR. ROONEY:  Objection.

3                   THE COURT:  Do you know where Ms. Weinbaum was

4        when this happened?

5                   THE WITNESS:  My recollection is she was walking

6        from the podium.  As you see there is a hallway and, as I

7        said, there are two ways on the side that you can go.  She

8        had left.  I was not watching Andrea.

9                   THE COURT:  So you don't know what her range of

10       view was at any point during the interaction with Mr.

11       Taebel?

12                  THE WITNESS:  No, I do not, Your Honor.

13                  THE COURT:  So that is going to be the answer, Mr.

14       Taebel.  Move on.

15       Q    You said you were never in the elevator, she says you

16   were in the elevator?

17                  MR. ROONEY:  Objection.

18                  THE COURT:  Sustained.  The portion about Ms.

19   Weinbaum saying that Mr. Martoni was in the elevator is not

20       evidence in the case, it is stricken, the jury is directed

21       to disregard.

22                  When she testifies, Mr. Taebel, you can ask her

23       what you want to ask her and if there is an inconsistency

24       between their testimony you can point that out to the jury

25       in your summation.  Let's move on.

1              THE COURT:  Would you read it back, please, Dawn?

2         Q    Do you understand --

3              THE COURT:  No, no, sir, I asked the reporter to

4    read it back.

5              (WHEREUPON, THE REQUESTED PORTIONS

6    OF THE TRANSCRIPT WERE READ)

7              THE WITNESS:  I did not accuse him.

8              THE COURT:  No, sir, answer his question.  If

9    someone lived in the building and you challenged them, you

10   understand why they might consider that rude?

11             THE WITNESS:  No, sir.

12             THE COURT:  Okay.

13        Q    Moving on to that time, that incident.  I remember very

14   clearly and I actually sent a text --

15             MR. ROONEY:  Objection.

16             THE COURT:  Sir, no, sir, you don't get to testify

17   at this point, okay.

18             THE DEFENDANT:  Okay, Your Honor.

19             I am submitting, I am submitting a photo of a text

20   from myself to Ms. Toro on that date.

21             THE COURT:  Sir --

22             MR. ROONEY:  Objection.

23             THE COURT:  You can't do that.

24             THE DEFENDANT:  Can't do what, Your Honor?

25             THE COURT:  You can't offer evidence with respect

1       to your own conduct.  Your testimony has nothing to do with

2       this witness.  You get --

3                   THE DEFENDANT:  His name is in the message.

4                   THE COURT:  Sir, sir, you get to do that if and

5       when you decide to testify, okay?  Ask Mr. Martoni questions

6       about what he did and saw on whatever date you think is

7       relevant here.  If there is an earlier incident you want to

8       ask him about, ask him about it, but just ask him questions.

9       Q     So, once again, you claim the first time you saw me was

10      when?

11      A     Sometime in August.

12      Q     Sometime in August.  Wow.

13      A     Wait, let me clarify that.  Not the first time I had

14      seen you.  The first time I had seen you I can't remember.  The

15      only time I had seen you --

16      Q     Oh?

17                  THE COURT:  Mr. Taebel, quit the comments, okay.

18                  The jury is directed to disregard them.

19                  Let the witness answer the question.  You asked

20      him when the first time was that he saw you.  Keep quiet

21      till the question is answered.

22                  THE WITNESS:  I had seen the gentleman leaving

23      with Raquel Toro on other occasions.

24                  THE COURT:  Before the beginning of August?

25                  THE WITNESS:  Yes, Your Honor.

1       THE DEFENDANT:  Your Honor, he's just

2   contradicted --

3       THE COURT:  No, sir, you don't address me.  You

4   ask questions of the witness, you don't make argument.

5       Let's go over to the sidebar.

6       (THE FOLLOWING TAKES PLACE AT

7   SIDEBAR, OUT OF THE HEARING OF OPEN COURT,

8   AMONG THE COURT AND COUNSEL)

9       THE COURT:  If you refuse to follow my

10   instructions and if you refuse to follow the law as to what

11   cross-examination is about, you can forfeit the right to

12   represent yourself and I will have Mrs. Hauser come in as

13   standby counsel and do what needs to be done.  This is not a

14   point for you to make argument.  You don't address anything

15   to me, your questions are all directed to Mr. Martoni and

16   they are about things that Mr. Martoni did and said.  If you

17   want to ask him more about when the first time was that he

18   saw you, what happened earlier in August, any of that stuff,

19   that is fine, but you have to ask about it and you have, if

20   you want to ask a leading question you can ask a leading

21   question, but that is, you know, isn't it true that on such

22   and such a date such and such a thing happened, that is a

23   leading question.  That you sent Ms. Toro a text about

24   something is totally irrelevant.  It is not even admissible,

25   I don't believe, on your own testimony.  You can testify

1   that you sent Ms. Toro a text and this is what you wrote in

2   the text, but the text itself doesn't come in.

3           He can testify about his own conduct.

4           MR. ROONEY:  But it is not statements --

5           THE COURT:  He can testify about his own

6   statements.

7           MR. ROONEY:  For the truth?

8           THE COURT:  His own statements?  Absolutely.  One

9   can testify --

10          MR. ROONEY:  Out-of-court statements are

11  admissible?

12          THE COURT:  You can cross examine on them.

13          Okay?

14          THE DEFENDANT:  Okay, yes, Your Honor.  I am just

15  trying to point out the contradictions in his statement.

16          THE COURT:  But you don't point out -- what

17  contradictions in his statement are you trying to point out?

18          THE DEFENDANT:  Because what he told the grand

19  jury and what he --

20          THE COURT:  Well, if there is something in his

21  grand jury testimony that is not -- I told you this when we

22  were doing, when I was inquiring as to your desire to

23  represent yourself that there is a right way to do this and

24  a wrong way to do this.  You didn't listen to me.  You can

25  listen now or you can try to do it your way.  If you try to

1    do it your way it won't come in and that will be the end of
2    it and I will be upheld, I can promise you that.
3             The question you ask him is, if you think he's
4    testified to something here that is not consistent with what
5    his grand jury testimony was -- you want to tell me the
6    subject about it?
7             THE DEFENDANT:  Yeah.  He said the first time he
8    saw me was sometime in August.  He told the grand jury and
9    now he just made an exception and he said actually that is
10   not the first time he saw me.  So he just --
11            THE COURT:  And if you think that that is worth
12   cross-examining him on, then what you would say is, you
13   know, just so we are clear, you saw me long before the
14   beginning of August, correct?  You saw me with Ms. Toro?
15            Yes.
16            Do you recall when it was that you saw me with Ms.
17   Toro?  Was it in July, was it in June, was it, you know?
18            And he will say I don't remember.
19            And then do you remember testifying before the
20   grand jury on September -- no, this was much later, whatever
21   date it was that he testified before the grand jury, do you
22   remember being under oath when you were asked questions?
23            Do you remember giving the, being asked the
24   following question and giving the following answer?
25            Question, what was the first time you saw Mr.

1     Taebel?

2                Answer, August 2011.

3                Was that answer true at the time you gave it?

4                He answers it.  You move on.  That is the end.

5     That is how that happens.  If you don't want to do it that

6     way, it is not gonna happen, okay.

7                THE DEFENDANT:  Okay.

8                (WHEREUPON, THE FOLLOWING TAKES PLACE BACK IN THE

9     HEARING OF OPEN COURT)

10    Q    Mr. Martoni, do you remember your statements made to

11    the grand jury?

12               THE COURT:  Well, no.  Let's first clarify what we

13    are talking about.

14               When is the first time that you think you saw Mr.

15    Taebel?

16               THE WITNESS:  The first time?  I honestly don't

17    remember, Your Honor.  I couldn't say.

18               THE COURT:  And you have no clue as to whether it

19    was, it was some point before August?

20               THE WITNESS:  Yes.

21               THE COURT:  And you don't remember if it was

22    April, May, June or July?

23               THE WITNESS:  Honestly, Your Honor, I do not.

24               THE COURT:  Do you know if it was some point in

25    2011 or before that?

Martoni - cross - Defendant          page 74

1          THE WITNESS:  I would say it was in 2011 probably.
2          THE COURT:  And more definitely than that you
3     can't be?
4          THE WITNESS:  I am sorry, Your Honor.
5          THE COURT:  Do you remember testifying before the
6     grand jury?
7          THE WITNESS:  Yes, sir.
8          THE COURT:  You remember you were under oath when
9     you testified?
10          THE WITNESS:  Yes, Your Honor.
11          THE COURT:  You want to give a question that you
12     want to ask Mr. Martoni about?
13          THE DEFENDANT:  Yes, Your Honor, it is right here.
14          THE COURT:  No, tell me the page and line number.
15          THE DEFENDANT:  Page eight, line six is the
16     question.
17          THE COURT:  So do you want to read the question,
18     answer, question, answer?  And I guess that is line six
19     through line 10.  Do you want to read those, Mr. Taebel?
20          THE DEFENDANT:  Yes.
21          THE COURT:  Do you remember being asked the
22     following questions and giving the following answers?
23     Q    Do you remember being asked approximately when did you
24     first meet this person?
25          THE COURT:  No, no.

Martoni - cross - Defendant          page 75

1          THE DEFENDANT:  All right, I will move on.

2          THE COURT:  You don't have to move on, Mr. Taebel.

3    It is not difficult.  If you would just listen you could do

4    it right.

5          Sir, do you remember being asked the following

6    questions and giving the following answers?

7          Question:  "Approximately when did you first meet

8    this person?"

9          Answer:  "Sometime in August."

10         Question:  "Of?"

11         Answer:  "2011."

12         Was that testimony true at the time you gave it?

13         THE WITNESS:  Yes.

14         MR. ROONEY:  Your Honor, just for the record, that

15   is not inconsistent with his testimony.

16         THE COURT:  Well, that is for the jury to

17   determine.  That is argument.  Sit down.

18         Mr. Rooney's comment is stricken, the jury is

19   directed to disregard it.  It is up to you to determine

20   whether that is inconsistent with the testimony that Mr.

21   Martoni gave.

22   Q    Also like to ask you to clarify another statement that

23   you made to the grand jury.

24         THE COURT:  No, you can't ask him to clarify a

25   statement he made to the grand jury.  You can impeach him

1    with a statement that he made to the grand jury if it's not

2    consistent with his trial testimony.  If there is something

3    in the grand jury testimony that you don't understand what

4    it means, the grand jury testimony cannot be brought into

5    the trial.

6              Grand jury testimony is admissible to the extent

7    that it is inconsistent with trial testimony.  You can't

8    consider the grand jury testimony for its truth, it is only

9    admitted so that you can evaluate the truthfulness of any

10   witness's trial testimony, that is the importance of it at

11   this stage.

12             So if there is a subject matter that Mr. Martoni

13   talked about before the grand jury, you can ask Mr. Martoni

14   now about the general subject matter.  If you think his

15   answer is inconsistent with what he testified in the grand

16   jury, then you can impeach him with it or, if you want to,

17   you can show him, after he gives you an answer that you are

18   not satisfied with you can show him the testimony and have

19   him read it to himself and ask him if that refreshes his

20   recollection as to something else, okay.

21             THE DEFENDANT:  Yes, sir.

22   Q    Does that refresh your recollection of the date when

23   you stopped me?

24             THE COURT:  Doesn't work that way, Mr. Taebel.

25   You are inquiring about the date prior to September 2nd when

1    Mr. Martoni stopped you, correct?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  And he's already testified that he

4    doesn't recall when it was.

5              Correct, sir?

6              THE WITNESS:  Yes, Your Honor.

7              THE COURT:  And if you think there is something in

8    his grand jury testimony that might refresh his recollection

9    as to when that was, you can show him, but you can't impeach

10   him because he says he doesn't recall.  You can show him his

11   grand jury testimony, the portion that you are concerned

12   about, and ask him if that refreshes his recollection as to

13   when he stopped you and if it does, it does, and if it

14   doesn't, it doesn't.  Would you like to proceed that way,

15   sir?

16             THE DEFENDANT:  Yes.

17             THE COURT:  So why don't you talk about a page in

18   mind and give him a copy of the grand jury testimony or I

19   will hand him mine if that makes life easier and we will let

20   him read it and then he will tell you whether or not that

21   refreshes his recollection.

22             What page are you requesting he take a look at,

23   sir?

24             THE DEFENDANT:  Page eight, line 12.  He

25   clarified --

Martoni - cross - Defendant                    page 78

1          THE COURT:  No, sir, line 12 has nothing to do --

2          THE DEFENDANT:  Your Honor --

3          THE COURT:  It is entirely unclear as to whether

4     that has anything to do with a prior date or not and it

5     involves hearsay and I am not letting you ask about it or

6     allowing Mr. Martoni to testify about it.

7          THE DEFENDANT:  I am sorry, his grand jury

8     statement is hearsay?

9          THE COURT:  A portion of it, a portion of it is.

10    And, in fact, not to -- Mr. Rooney, in fact, instructed the

11    grand jury that it was hearsay and that they couldn't

12    consider it for it's truth.

13         THE DEFENDANT:  Your Honor, I am pointing it out

14    to you.

15         THE COURT:  Sir, don't argue with me.  That is

16    what you were concerned about, the part --

17         THE DEFENDANT:  Can I speak?

18         THE COURT:  What?

19         THE DEFENDANT:  All right.

20         THE COURT:  We are talking about the answer that

21    begins, the sentence that begins on line 13 and on page

22    eight, is that what we are talking about, sir?

23         THE DEFENDANT:  I am talking about the question --

24         THE COURT:  No, answer my question, sir.

25         THE DEFENDANT:  I am answering it.

Martoni - cross - Defendant          page 79

1          THE COURT:  I am sorry?

2          THE DEFENDANT:  I am trying to answer it.

3          THE COURT:  I want you to answer it in my terms

4     though so that you don't improperly put material before the

5     jury.

6          So we are talking about the answer that, the part

7     of the answer that begins on line 13 and goes through line

8     15 on page eight, correct?

9          THE DEFENDANT:  No.

10          THE COURT:  Okay, then what is it that you want

11     him to take a look at?  Tell me where in the testimony it

12     is.

13          THE DEFENDANT:  Page eight, line six,

14     approximately when --

15          THE COURT:  We just did that.  We just asked him

16     about that.

17          THE DEFENDANT:  Can I speak, Your Honor?  I have

18     to finish my sentence so I can tell you what I am saying

19     here.

20          THE COURT:  Not in front of the jury, sir, because

21     you don't seem to be following my instructions.  So we can

22     go over to the sidebar if you'd like and you can tell me

23     there what it is you want to do, okay?  Would you like to do

24     that, sir?

25          THE DEFENDANT:  Sure.

1          (THE FOLLOWING TAKES PLACE AT

2     SIDEBAR, OUT OF THE HEARING OF OPEN COURT,

3     AMONG THE COURT AND COUNSEL)

4          THE DEFENDANT:  What I am trying to point out here

5     is he clarifies approximately when you first met this

6     person.  Line 12, how did you come to meet this person?   I

7     had seen him --  the question Mr. Rooney asked him --

8          MR. ROONEY:  Mr. Taebel, the whole point of

9     sidebar is so the jury can't hear.

10         THE COURT:  Keep your voice down.

11         THE DEFENDANT:  All right, I need to be able to

12    speak a sentence without someone interrupting me so you can

13    understand.  I am going to do it slow.

14         THE COURT:  And quietly.

15         THE DEFENDANT:

16         His question:  "Approximately when did you first

17    meet this person?"

18         Answer:  "Sometime in August."

19         Then Mr. Rooney's question:  "How did you meet

20    this person?"

21         Martoni's answer:  "I had seen him with the

22    tenant.  They would leave in the morning."

23         He clarified how he came to meet me and he said

24    that that was in, sometime in August.

25         THE COURT:  What is your point?

Martoni - cross - Defendant                    page 81

1        THE DEFENDANT:  My point is that he said the first

2    time that he would see me leave in the morning was in the

3    middle of August and that is clearly, that is clearly a lie.

4        THE COURT:  He is not saying middle of August.

5        THE DEFENDANT:  Sometime in August.

6        THE COURT:  Sometime in August.  So if you want to

7    say to him did you see Mr. Taebel leave --

8        MR. ROONEY:  He's already said that.  You got the

9    points that you want, sir.

10        THE COURT:  He said -- he already said that he saw

11    you some point before August leave with Ms. Toro in the

12    morning, so what do you want?

13        THE DEFENDANT:  He didn't say that in the grand

14    jury.

15        THE COURT:  I understand that, but it wasn't

16    exactly as though that was what the question was about.  If

17    you want to -- you know, I don't see that there is any

18    particular relevance to that, so I am not going to permit

19    you to go into it, okay.

20        (WHEREUPON, THE FOLLOWING TAKES PLACE BACK IN THE

21    HEARING OF OPEN COURT)

22    Q    I'd like you to clarify another statement that you made

23    to the grand jury.

24        THE COURT:  Well, can we ask these questions

25    properly, Mr. Taebel?  Why don't you ask a question without

*Dawn M. Candella*
*Senior Court Reporter*

1    reference to the grand jury and then we will see whether or

2    not there is an inconsistency between what Mr. Martoni is

3    saying now and what he told the grand jury, okay?

4    Q    Mr. Martoni, did you say no one was going --

5              THE COURT:  I am sorry?

6              THE DEFENDANT:  He said no one was going

7    unchallenged.  I would like to know what he meant by that.

8              MR. ROONEY:  Objection.

9              THE COURT:  He said that on his direct

10   examination?

11             MR. ROONEY:  No, that is not what he, what he is

12   saying.  He is quoting from --

13             THE COURT:  I don't care whether he is quoting or

14   not.

15             MR. ROONEY:  -- from the grand jury testimony.

16             THE COURT:  Mr. Rooney, you don't get to interrupt

17   me either.

18             MR. ROONEY:  I am not trying to, I am trying to

19   abide by your rulings.

20             THE COURT:  So keep quiet.

21             Mr. Martoni, you said -- when you were talking

22   about your duties as doorman you said no one goes

23   unchallenged, correct?

24             THE WITNESS:  You are to stop anybody that you

25   don't recognize and say excuse me, can I help you.

Martoni - cross - Defendant          page 83

1          THE COURT:  Do you have another question you want
2     to follow that up with?
3     Q    But you already clarified that you did know me.
4     A    I had seen you on previous dates, yes, sir.
5     Q    The first time that I began visiting the building was
6  in March.
7          MR. ROONEY:  Objection.
8          THE COURT:  Overruled.
9     Q    To clarify --
10         THE COURT:  He can ask the question, Mr. Martoni
11    can accept it or not.
12    Q    I moved in officially --
13         THE COURT:  Let him answer.
14         Ask a question.
15    Q    Do you know when I moved in officially?
16    A    No, sir.  As far as I know I had never received
17 anything that you had moved in.
18    Q    May 10th.
19         THE COURT:  Sustained.  The comment is stricken,
20    jury is directed to disregard.
21         If you want to testify, Mr. Taebel, you get to do
22    that later.  Mr. Martoni says that he never knew that you
23    had moved in.
24         Is that correct, sir?
25         THE WITNESS:  Yes, Your Honor.

1    Q    Are you aware of the roommate law?

2              THE COURT:  You can ask the question.

3              Are you aware of the roommate law in New York

4    State?

5              THE WITNESS:  I was informed by District Attorney

6    Rooney.

7              THE COURT:  But not till you were being prepared

8    for this case?

9              THE WITNESS:  That is correct, Your Honor.

10    Q    So could you, would you say that your management

11    company taught you policies outside of the law?

12              THE COURT:  Sustained.  That is not Mr. Martoni's

13    job here.  I have already told the jury that the policies

14    that Glenwood had may or may not have been consistent with

15    the law.  I will explain to them how that becomes relevant

16    in my final instructions if there is a basis in testimony to

17    do that, but at this point that is not a proper question to

18    ask him.

19              You had never been notified that Mr. Taebel was

20    Ms. Toro's roommate?

21              THE WITNESS:  No, Your Honor.

22    Q    Legally you don't have to be.

23              THE COURT:  Sustained.  It is stricken.

24    Q    Do they train you -- if you are going to prevent

25    someone from entering the building do they train you to call the

1   police or did they train you to use physical force?

2      A   I would call my superintendant first.  We are not

3   allowed to physically touch anybody.

4                THE DEFENDANT:  Your Honor, can I submit things

5      into evidence now?

6                THE COURT:  Only if they are things that Mr.

7      Martoni can identify.  If they are things that you can

8      identify, the answer is no.

9                THE DEFENDANT:  Okay, Your Honor, he should be

10     able to identify the statements to the grand jury.  I'd like

11     to put some of that in.

12               THE COURT:  No, because grand jury testimony isn't

13     admissible into evidence.  It is available for impeachment

14     purposes.

15               THE DEFENDANT:  Your Honor, I'd like to put my

16     credit card statements --

17               THE COURT:  No, sir, those come in on your case.

18               THE DEFENDANT:  During my testimony, Your Honor?

19               THE COURT:  I am sorry.

20               THE DEFENDANT:  Are you saying during my testimony

21     those come in?

22               THE COURT:  However you decide to put them in,

23     yes.  They don't come in on the People's case.  There is

24     nothing that Mr., Mr. Martoni can't look at that and say

25     that this is any material that he is familiar with or can

Case 2:18-cv-00046-GMS   Document 1   Filed 01/05/18   Page 56 of 142

1   identify or anything else.

2          THE DEFENDANT:  I am bringing forward the proof

3   that his statements contradict evidence that I have here.

4          THE COURT:  Sir, that is what summation is about.

5   You need to put evidence in and you don't have, you don't

6   get to put evidence in on the People's case unless it is

7   evidence that relates to something dealing with this

8   witness.

9          You have other pictures of the incident, you have,

10  you know, contradictory statement Mr. Martoni made someplace

11  or another, that is all fine, that can come in here, but

12  what is essentially your evidence needs to wait for your

13  case.

14         THE DEFENDANT:  And by my case do you mean my

15  testimony?

16         THE COURT:  That is generally what we mean by your

17  case unless you have another witness that is available to

18  put things in.  You don't have to testify, there is no

19  obligation on your part to testify, but if you want to

20  produce evidence there needs to be a testimonial foundation

21  for it and if it is not you it needs to be somebody else.

22         THE DEFENDANT:  I will have a letter here signed

23  and notarized by the girlfriends which contradicts his

24  statements.

25         THE COURT:  No, sir.  And just so we are clear --

1          The jury is going to be instructed to disregard

2     that.

3          It is a trial, we only take testimony that is

4     live, we don't take sworn statements from anyone, so if Ms.

5     Toro or anyone else gave you a sworn statement, you can rip

6     it up and put it in the trash unless you want to hold onto

7     it in case they come and testify and their testimony isn't

8     consistent, but you can't prove a case with sworn testimony,

9     you have to bring in live -- with sworn statements, you have

10    to bring in live witnesses.

11          Do you have anything else for Mr. Martoni?

12    Q    Are you claiming that I was not living there or you

13    were not aware of it?

14          THE COURT:  Do you know if Mr. Taebel was living

15    in the building on September 2nd?

16          THE WITNESS:  As far as I am aware he was not on

17    the list.

18          THE COURT:  Sir --

19          THE WITNESS:  So, no.

20          THE COURT:  That is not really the question, okay.

21    There is list and there is reality.  Did you know if he was

22    living there, if he was regularly in and out and that was

23    where he was staying?

24          THE WITNESS:  No, Your Honor.

25          THE COURT:  You didn't see him frequently enough

Case 2:18-cv-00046-GMS   Document 1   Filed 01/05/18   Page 58 of 142

1    to be able to make that judgment or --

2              THE WITNESS:  I didn't see him frequently.

3              THE DEFENDANT:  I think common sense --

4              THE COURT:  Sir, we don't have argument at this

5    time.  You have questions for Mr. Martoni, ask him

6    questions.

7    Q    If you were going to use physical force to prevent

8    somebody from entering the building, what would your

9    justification be and what --

10             THE COURT:  Sustained.  That is called the

11   hypothetical question and you can't ask a hypothetical

12   question other than of an expert witness.  Witness has

13   testified that he used no physical force.

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  If your version is different and if

16   you choose to testify you can bring that to the jury's

17   attention.

18             THE DEFENDANT:  I'd like to have the witness

19   impeached.  He's obviously lied and --

20             THE COURT:  Sir, the comment is stricken and the

21   jury is directed to disregard it.

22             Do you have something else you wish to impeach him

23   with other than you disagreeing with his testimony?  We

24   understand -- well, I am going to withdraw that.

25             THE DEFENDANT:  Okay, I think that is it for now.

1          THE COURT:  Do you have any redirect?

2          MR. ROONEY:  No, Your Honor.

3          THE COURT:  Thank you, you are excused.  Thank

4     you, sir.

5          THE WITNESS:  Thank you, Your Honor.

6          (WHEREUPON, THE WITNESS WAS EXCUSED

7     AND LEFT THE WITNESS STAND)

8          THE COURT:  And I am going to ask you to come back

9     after lunch for Officer Farinaccio.  That should not be very

10    long.  I apologize that because we waited for Ms. Hiles --

11    and, by the way, I did get a message, we got a message from

12    Ms. Hiles at about 12:30 or so that she was not feeling well

13    and had been at the doctors.  I am sorry, I wish she could

14    have picked up the phone and told us that a couple hours

15    earlier, but I have sympathy for people who aren't feeling

16    well and go to the doctors, so there is a limit to how

17    critical I can be.

18          So I need to give you some admonitions before we

19    break.  We will probably work between 15 minutes and a half

20    an hour and then you will go home for the day and come back

21    on Wednesday morning at 9:45.  That means tomorrow you are

22    back at work.  So if you want to give your employers a heads

23    up over lunch, this would be a good time to do it.  Tell

24    them they are going to see you tomorrow, but just for the

25    day tomorrow, that you are back in court on Wednesday.

*Dawn M. Candella*
*Senior Court Reporter*

1     tried, people punch people in the eyes and sometimes the
2     orbital bone is very fragile, breaks quite easily and is a
3     real mess to have repaired if it's a displaced fracture.
4     And it is also, you know, sort of lucky to the extent that,
5     there isn't going to be a physician to testify about it, but
6     it is also pretty dangerous because there is a risk that the
7     eyeball falls back, depending on the nature of the fracture,
8     and that there is a lot of permanent damage.  They must have
9     been fairly confident that the risk of that happening here
10    was remote because Workers' Comp or not, no one sits around
11    with a fractured orbital for a month and waits for surgery
12    unless a doctor has told him it is okay to wait, otherwise
13    you go ahead and get your surgery and take your chances.
14    But that is the charge with which, that is the charge that
15    is important here to you in terms of whether you walk out of
16    this courtroom at the end or not, okay?
17              Wednesday morning 9:45.
18              MR. ROONEY:  Do you want me to make copies of the
19    documents?
20              THE DEFENDANT:  I have already expressed how I
21    feel about talking to you.  I said no.
22              MR. ROONEY:  Have a nice day.
23              (WHEREUPON, THE PROCEEDINGS WERE
24    ADJOURNED UNTIL JANUARY 16, 2013)
25

Case 2:18-cv-00046-GMS   Document 1   Filed 01/05/18   Page 61 of 142

1    A    Basically more of the same.

2    Q    More of the same thing that he said to Frank?

3    A    Right.

4    Q    Using --

5              THE COURT:  It is Mr. Martoni, please.

6              MR. ROONEY:  I am sorry, my apologies.

7    Q    More of the same things that he said to Mr. Martoni?

8    A    Correct.

9    Q    Did he use curse words with you?

10   A    Yes.

11   Q    Can you describe his tone of voice at that time?

12   A    He was angry.

13   Q    And what happened after you spoke with the defendant?

14   A    He proceeded to walk towards the elevator.

15   Q    And did you see what, if anything, Mr. Martoni did at

16   that time?

17   A    Yeah, Mr. Martoni started to run after him and then saw

18   that the elevator was open, that the defendant was going to.

19             THE COURT:  Well, you can't testify what Mr.

20   Martoni saw.  You can tell us what you observed, but you

21   can't tell us what someone else saw.

22   Q    So just what you actually saw.

23   A    Yeah, Mr. Martoni ran after the defendant.

24   Q    And what happened at that point?

25   A    The defendant kept going towards the elevator and Frank

Case 2:18-cv-00046-GMS   Document 1   Filed 01/05/18   Page 62 of 142

1    basically put his arms at his sides preventing.

2                THE COURT:  I am sorry, whose arms at whose side?

3                THE WITNESS:  Frank Martoni put his arms out.

4                THE COURT:  His own arms?

5                THE WITNESS:  Yes, like this, against the elevator

6        so that the defendant would not go in the elevator.

7        Q    Where was the defendant when Frank was positioned?

8        And just for the record, you are extending your arms

9    slightly lower than your shoulders out to the side?

10       A    Correct.  The defendant was facing him at that time.

11       Q    And where were you when this --

12       A    I was at the door.  I was -- there was nobody at the

13   door and people were kind of coming in, looked like they were

14   coming in, so I stayed there and then I turned around and I no

15   longer saw both Mr. Martoni and the defendant.

16       Q    So when you say you turned around, which way were you

17   facing?

18       A    I was facing towards the door.

19                THE COURT:  The door, meaning the front door of

20       the building?

21                THE WITNESS:  The front door of the building.

22                THE COURT:  This is the Friday of Labor Day

23       weekend?

24                THE WITNESS:  I honestly don't remember.

25                THE COURT:  Do you remember what day of the week

1      it was?

2                   THE WITNESS:  I don't.

3      Q    And when you turned around, what did you see?

4      A    Well, I didn't see either person.  I kind of made the

5      assumption that they were --

6                   THE COURT:  Let's not talk about the assumptions

7           that you made.

8                   THE WITNESS:  Okay.

9      Q    You didn't see --

10     A    I didn't see anyone, no.

11     Q    Did you come to see either of those people again?

12     A    I did.  I saw Frank come out of the elevator holding

13     his left eye.

14     Q    What did you do at that time?

15     A    I ran to get help.  My superintendant was nearby so I

16     assumed that he could be of help.

17                  MR. ROONEY:  I am going to put on the monitor

18          what's been previously entered into evidence as People's 5.

19                  THE COURT:  Just so we are clear, you didn't see

20          what interacted between the two of them after you saw Mr.

21          Martoni attempt to block the elevator door?

22                  THE WITNESS:  No, I did not.

23                  THE COURT:  Thank you.

24     Q    Where was the defendant -- how far away from Frank

25     Martoni was the defendant when you saw Frank in front of the

Case 2:18-cv-00046-GMS Document 1 Filed 01/05/18 Page 64 of 142

1   elevator?

2       A    Very close.

3       Q    Very close arms distance, very close further away,

4   closer than arms distance?

5       A    He was pretty much in his face.

6       Q    And at that point is when you turned around toward the

7   front door?

8       A    Yes, I did.

9       Q    Do you recognize what is being, what is depicted in

10  People's 5?

11      A    That is our lobby, the lobby of The Barclay.

12      Q    And is that a fair approximation of your view of the

13  elevator corridor when Frank Martoni and the defendant were in

14  the elevator door?

15      A    Yes.

16      Q    From that perspective that you had, could you actually

17  see the elevator door open?

18      A    Yes, I did.  I was a little bit this way.

19      Q    Could you see inside the elevator?

20      A    No.

21      Q    And you indicated that after you saw Frank come out you

22  went to the, the super, to find the super, is that correct?

23      A    Yes.

24      Q    I am putting on the monitor what is in evidence as

25  People's 4.

1    charges in the indictment.

2             THE DEFENDANT:  I don't think so.

3             THE COURT:  So do you want to tell me why you

4    think that the evidence that we have heard, that is all I am

5    dealing with, I am not dealing with what you are going to

6    say, I am dealing with what we have heard, why that evidence

7    doesn't support a prima facie case.

8             THE DEFENDANT:  Already there is contradictions in

9    both the witnesses' statements.

10            THE COURT:  Contradictions don't go to whether

11   there is a prima facie case.  The question is in the light

12   most favorable to the People.

13            THE DEFENDANT:  I really don't understand exactly

14   what you are saying.

15            THE COURT:  It is unfortunate that you didn't do

16   the homework.

17            I am going to reserve with respect to the first

18   count.  I think there is a real question as to whether there

19   is any proof that would suggest that Mr. Taebel's intention

20   was to cause serious physical injury, so I am going to

21   reserve as to that.

22            Do you intend to testify, Mr. Taebel?

23            THE DEFENDANT:  I believe I do, yeah.  I have to

24   submit the evidence and that is how.

25            THE COURT:  That is the way that you put in

1    they were just being, you know, they were being jerks I
2    mean.  And, so, Ms. Weinbaum then offered her hand and, you
3    know, introduced herself and, you know, I shook her hand and
4    I tried to, like, reason with her for a second, but it
5    wasn't going anywhere and she, she basically told me well,
6    if you don't have permission you are not going in.  And I
7    was like, are you kidding me?  Like, you can call the police
8    if you want to, but, you know, that is it.  You can't try
9    and stop me, you can't physically try and stop me.  And then
10   I continued to walk past and the door opened.
11            THE COURT:  The door to what?
12            THE DEFENDANT:  The elevator door opened at that
13   point and they had no legal grounds to try and stop me and I
14   knew that.
15            THE COURT:  That comment is stricken, the jury is
16   directed to disregard.  That is one of the issues in the
17   case.
18            Go ahead.  The elevator door opened.
19            THE DEFENDANT:  The elevator doors open and this
20   guy, like, jumps in front of me, he is trying to block me,
21   my access to the elevator, you know, and I pushed right
22   through into the elevator.  And once inside the elevator he
23   continued, that is when he, like, lost it, like he was,
24   like, you know, he just lost it and he started attacking me
25   and it turned into, like, a frantic grabbing match.  And I

1    got hit in the face in the middle of it and, you know, I got

2    him off me once, but he just came back at me like faster and

3    harder and he just wouldn't stop.  And being in the elevator

4    I really couldn't back up, I couldn't retreat, that wasn't

5    even an option at that point.  So, as I said, I did get hit,

6    I had, like, a bloody lip.  I told the police that but it

7    stopped bleeding by the time they even, I was even there

8    talking about it.

9            So anyways, I have taken self-defense classes and

10   in college and high school and they basically teach that you

11   have to do what you have to do to maintain control of an

12   altercation.  If somebody is attacking you, you can't give

13   them the upper hand in the conflict.  So, I mean, I tried

14   to, like, get him off me, but, you know, he is a big, heavy

15   guy and I didn't have a lot of room to move around.  So

16   anyways, I struck him and that is what I had to do to get

17   him off me and so that was, that is what happened.  And

18   after -- and I immediately stopped, I only struck him once

19   and then he stopped and he kind of, you know, paused for a

20   minute.  The door opened and then I walked out and he kind

21   of, like, followed me out.

22           THE COURT:  The door opened on what floor?

23           THE DEFENDANT:  The same floor.  We didn't go

24   anywhere.  So, yeah, the door opened, I stepped out, he

25   followed and that was it.  Then it opened back up again and

1    right?

2        *A*    Yes, correct.

3        *Q*    And during this time you also have a gym membership at

4    Bally's, isn't that right?

5        *A*    A nationwide Bally's, yes, correct.

6        *Q*    Nationwide because you travel a lot, right?

7        *A*    Right.

8        *Q*    And you use the one in California, right, Los Angeles?

9        *A*    I am sorry?

10       *Q*    You used a Bally's in Los Angeles, correct?

11       *A*    I used a Bally's in Los Angeles.  Not while I was in

12   New York.

13       *Q*    Obviously.  Even you can't be in two places at once.

14               THE COURT:  Sustained.

15               Comment is stricken, the jury is directed to

16           disregard.

17       *Q*    When you were living in New York your membership at

18   Bally's was still active, is that correct?

19       *A*    Correct.

20       *Q*    You didn't cancel it when you moved to New York?

21       *A*    No.  I do travel a lot, you just said that.

22       *Q*    And you agree you travel a lot and you traveled a lot

23   in the periods between May and September 2, 2011?

24       *A*    Well, I am kind of locked in for a very inexpensive

25   monthly rate, so I didn't want to end my membership.

1    A    Outrun?  That wasn't my intention to outrun him.

2    Q    But you thought he was chasing you?

3    A    Yes, he was pursuing me, correct.

4    Q    Do you believe that you could outrun him?

5              THE COURT:  Sustained.

6    Q    There was nobody else in that area near the elevators,

7  correct?

8    A    Just Ms. Weinbaum.

9    Q    And wasn't in the corridor with you and Mr. Martoni,

10  was she?

11   A    No, she was not.

12   Q    And you testified on direct examination that you did

13  strike Frank Martoni in the left eye, correct?

14   A    Correct.

15   Q    And it is your testimony that you hit him one time, is

16  that right?

17   A    In self-defense, yes.

18   Q    Your testimony is that you hit him one time?

19   A    Yes.

20   Q    You are sure about that?

21   A    Yes.

22   Q    Now, you indicated on your testimony that Frank Martoni

23  was standing in front of the door, is that right?

24   A    He tried to block my entrance into the elevator, yeah.

25   Q    Tell the jury how did he try to block your entrance

Case 2:18-cv-00046-GMS   Document 1   Filed 01/05/18   Page 70 of 142

1    trying, you know, to control my ability to get in the elevator.

2        Q    But he didn't try to touch you?

3        A    He did.  He stepped -- he intersected me as I was going

4    into the elevator.

5        Q    Did he try to touch you with his hands?

6        A    He did as we went into the elevator and once we were in

7    there, yes, he was attacking me, was grabbing me.

8        Q    We will get there.

9        A    All right.

10       Q    I am trying to break it down so the jury can

11   understand.

12       A    I know.

13       Q    Before you were in the elevator did Frank Martoni ever

14   touch you with his hands?

15       A    With his --  he used his arms.

16       Q    His arms.  Which part of his arms?

17       A    The inner parts of his arms.

18       Q    He touched you like this?

19       A    He went like this and I was --

20            THE COURT:  So Mr. Taebel, from what I understand

21       of your testimony Mr. Martoni got in front of you and using

22       his body and his arms that were held out to the sides

23       attempted to block you from entering into the elevator,

24       correct?

25       A    Correct.

1            THE COURT:  Okay.  And at that point he didn't

2    physically touch you, he inserted himself in front of you,

3    correct?

4        A    Yeah, but I'd say we kind of collided as he stepped in

5    front of me, so --

6        Q    So you wouldn't say that you pushed him in, you would

7    say you collided and then went into the elevator together?

8        A    Right.  He was stepping backwards, as we collided he

9    stepped backwards into the elevator.

10       Q    Your testimony is that Mr. Martoni stepped backwards

11   into the elevator?

12       A    It was probably a combination of me pushing him back as

13   well.

14       Q    So you did push him?

15       A    Yeah, but he pushed me too.

16       Q    But not first?

17       A    Yeah, he did.  He did push me first.

18       Q    So your testimony now is that Mr. Martoni pushed you

19   first and only then did you push him?

20       A    I overpowered him.  He stepped in front of me

21   physically trying to block me, I'd say that is pushing.

22       Q    So that is -- when you say that he pushed me, that is

23   what you mean that he stepped in front of you, is that right?

24       A    He stepped into me.

25       Q    Because you were walking in the, that direction as you

Taebel - cross - People                    page 189

1    Q    He didn't ever hit you with his radio, right?

2    A    Hit me with the radio?   Not that I remember.

3    Q    He had a radio in his hands, right?

4    A    No.

5    Q    He didn't have a radio in his hands?

6    A    No.

7    Q    Did you see the video where he grabs the radio?

8    A    Yeah.  He must have dropped it or it must have been on

9    his belt or something.

10   Q    You never saw it drop, right?

11   A    He was attacking me with two hands, I don't know.

12   Q    So that would be no, you never saw him drop it?

13   A    I don't know where the radio was.  I wasn't --

14   Q    You never saw him put it on his belt?

15   A    I wasn't -- I was just trying to go upstairs, I wasn't

16   watching him what he was doing with the radio.  I don't know

17   what he did with the radio.

18   Q    I am not blaming you for not seeing it, I am asking if

19   you did see it.  Did you see him drop the radio, yes or no?

20   A    No, not that I can remember.

21   Q    Okay.  And -- do you need some more water, sir?

22        THE COURT:  Let our officers deal with that, Mr.

23   Rooney.  They are well trained and really don't need

24   direction from you.

25        MR. ROONEY:  I wasn't directing the officer.

Dawn M. Candella
Senior Court Reporter

Taebel - cross - People                    page 190

1            Officer, I am sorry.

2            If he took it that way I apologize.  I was just

3      looking out for Mr. Taebel.

4            THE COURT:  And that is stricken, the jury is

5      directed to disregard.

6            MR. ROONEY:  Yes, Your Honor.

7            THE COURT:  Not your job to look after Mr. Taebel.

8            MR. ROONEY:  Yes, Your Honor.

9      Q    And then so you didn't see him drop it and you didn't

10     see him put it in his belt, correct?

11     A    I don't know -- no, no.

12     Q    And then after this grappling and after -- your

13     testimony is after you got struck in the face, only then did you

14     strike him in the face, is that right?

15           THE COURT:  That is a yes?

16     A    Yes.

17     Q    And did this happen inside the elevator?

18     A    Yeah.

19     Q    Did you strike him with your right hand or left hand?

20     A    Right hand.

21     Q    To the left side of his face?

22     A    Correct.

23     Q    And you said you had taken some self-defense courses?

24     A    Correct.

25     Q    Would you say that you hit him as hard as you could?

1    Rooney?

2         MR. ROONEY:  Not that I can think of, no.  It is

3    pretty straight forward.

4         THE COURT:  Mr. Taebel, anything you are

5    requesting?

6         THE DEFENDANT:  You're reading all three counts to

7    them?

8         THE COURT:  I am going to give the jury all three

9    counts.  I am reserving whether or not there is sufficient

10   evidence to support a verdict on the first count, but I am

11   going to let them decide it.  If they acquit you, then there

12   is no issue.  If they convict you, then I will decide

13   whether or not there was sufficient evidence to support the

14   verdict of guilty.  That is the only one as to which I have

15   a question.  I don't think -- my gut tells me there is

16   probably not enough evidence there to support an inference

17   that the intention was to cause serious physical injury.

18        THE DEFENDANT:  Can anything be done about the

19   contradictions in their statements?  Because now she did

20   testify and she did officially say --

21        THE COURT:  In your summation you can argue that

22   their testimony was not consistent and these are the

23   contradictions you should consider.  Do it nicely, okay?  Do

24   it without accusing people of being liars.  You can call up

25   the contradictions, you can argue that Mr. Martoni wasn't

PEOPLE'S SUMMATION                    page 216

1   violent attack on that doorman that left Frank Martoni with

2   a broken face that had to be put back together with plates

3   and screws that will be in his face for the rest of his

4   life.  It is about what the defendant did to Frank Martoni

5   on September 2, 2011 and how the defendant's attack effected

6   Frank Martoni's life.  He couldn't eat normally, he couldn't

7   sleep normally and he couldn't go to work for over a month.

8   He couldn't do his job.  The same job that he's had for

9   basically his entire adult life.  A job to which he was so

10   dedicated that you can see him on the video holding his face

11   and continuing to do his job.

12         This is not a complicated trial, ladies and

13   gentlemen, and you may have gathered that from the shortness

14   of the actual trial portions of this last week.  And in a

15   few minutes you will deliberate and you will be asked to

16   decide the two questions that every criminal jury in this

17   country in our history is asked to answer.  Were the crimes

18   that are charged actually committed and is the defendant the

19   person who committed it?

20         THE COURT:  No, the question is did the People

21   meet their burden of proof beyond a reasonable doubt, that

22   is the question.

23         MR. ROONEY:  That is the question.  And the answer

24   to that question is a resounding yes on each charge and each

25   element of each charge.

Dawn M. Candella
Senior Court Reporter

1    that there is nothing from what you learned that in any way

2    would lead a reasonable person to believe that on September

3    2, 2011, Frank Martoni, a six foot three, 300 pound,

4    50-year-old doorman on duty with his white gloves and his

5    red hat armed with no self-defense or combat training, a man

6    who came in here wearing a fanny pack -- it is 2013, they

7    are very useful, but a man who wears that, a man who appears

8    as he does and who testifies as he does, there is no way

9    that that man would pick a fight with the defendant, at the

10   time a fit, 25-year-old man who, as you saw on video, had

11   just stepped aggressively toward that 50-year-old doorman

12   cursing at him.  A man you could all see could hardly

13   contain his disdain inside this courtroom, let alone in the

14   confines of that elevator corridor.  This was never

15   self-defense and everyone in here knows it, including and

16   especially the defendant.  That is why there are no pictures

17   or medical records documenting the split lip that he claims,

18   the split lip that Officer Farinaccio never saw.  All you

19   have is the defendant saying that Frank Martoni struck him

20   and caused him to have a split lip and that he wished he had

21   taken a picture of it.  Don't you think that would have been

22   important?   Don't you think after being arrested he might

23   say, hey, I should probably document this injury that I

24   suffered at the hands of that huge man?   Especially

25   considering this is someone who is very careful about

1    details.  He wants to get everything right.  He wants to

2    tape the police officers when they come to his door, but he

3    doesn't take a picture of the injury that he suffered?   He

4    didn't take any pictures because there weren't any juries.

5    He didn't suffer any injuries because he was never touched

6    by Frank Martoni.  But now we are at trial and he thinks

7    this is his best option to turn this into a credibility

8    contest between him and Frank Martoni.  He wants you to

9    believe that this was a fight that Frank Martoni started but

10   couldn't finish.  Really?   Think about what he is asking

11   you to accept.  He is asking you not only to believe that

12   Frank Martoni was the aggressor, but that he then came in

13   here and lied under oath about that.

14          Now, I have talked a little bit about why it makes

15   no sense that Frank Martoni was the aggressor, but let's

16   look a little deeper.  As I said, he testified he is not

17   trained in self-defense, martial arts, and that he is taught

18   never to use physical force on the job.  And what do we see

19   on the video?   You can play it when you are deliberating.

20   You see the defendant step toward --

21          THE COURT:  If you want to see it during your

22   deliberation you will write me a note and you will see it in

23   the courtroom.  You can't take it into the jury room.

24          MR. ROONEY:  It is all cued up, just a few

25   seconds.

PEOPLE'S SUMMATION                    page 224

1          Starting at 12:18:50, this is when the defendant

2    walks in.  Watch the body language of the three individuals

3    involved here.  Those two individuals, Frank Martoni in the

4    hat and Andrea Weinbaum next to him, those are the people as

5    the defendant described as acting like jerks with him.  And

6    look at what Frank Martoni does.  He walks slowly back,

7    grabs his radio and he back peddles and then they are out of

8    the picture.  Stopping at 12:19:43.

9          He grabs his radio to call for help.  He doesn't

10   move toward the defendant with his hands out, he doesn't

11   grab him in that lobby area, he backs up to stop the

12   elevator with his big body or his foot.  If he were going to

13   get physical, if Frank Martoni were the night-club-bouncer

14   type willing to throw his weight around, why wait till you

15   get back to the elevator?  Of course he's not going to do

16   that.  Frank Martoni knows that if he puts his hands on the

17   defendant his job will be in jeopardy, the only job that

18   he's had for most of his life.  Why would he do that?

19   Because Mitchell Taebel is so special?  Because of Raquel

20   Toro?  To protect a tenant's apartment when he knows that

21   tenant's not home.  The defendant can't answer these

22   questions because they are ridiculous because it didn't

23   happen.  Because Frank Martoni was not the aggressor.

24          For arguments sake, let's assume that in some

25   universe it were reasonable to believe that Frank Martoni

1   had been the initial aggressor and that the defendant

2   reacted with that first punch in self-defense.  How do you

3   think those additional punches played out?   Do you really

4   think Frank Martoni, the Frank Martoni you saw on the stand,

5   got punched in the face and went back for more, threatening

6   more harm on the defendant and forcing the defendant to

7   strike him again and again and again in self-defense?  You

8   think those second, third and fourth punches to the same

9   area of the face would have been necessary to subdue really

10  big, bad Frank Martoni?   Of course not.  And that means

11  that those punches were not justified.

12          But the defendant claims I only punched him once.

13  Frank Martoni is lying about that, I only punched him once.

14  And there we go back to admitting only what he can't deny.

15  Two men walking to an elevator, one comes out with a broken

16  face.  He has to admit that he hit him.  Of course I hit

17  him, but I just hit him once in self-defense.  Once he

18  realizes there is no video inside that elevator it is just

19  once.  I will admit the minimum and then I will say he is

20  lying about the rest.

21          And if the defendant's right, if Frank Martoni

22  started it, would Frank Martoni lie about it?   Everything

23  we do in this world we do for a reason and the big things,

24  big decisions in our life we do them for big reasons.  Lying

25  under oath is a big thing.  What big reason would Frank

1     Martoni have to do that in this case?   Frank Martoni has no
2     motive to lie in this case.   This isn't his mortal enemy, he
3     is not going to sue Mr. Taebel for millions of dollars of
4     his bartender earnings.   And, you know, Frank Martoni's
5     testimony was credible because you got to evaluate him on
6     the stand.   You saw how he answered questions from me and
7     from the defendant, how he responded to the judge, how he
8     admitted when he didn't remember something.
9             Now, the defendant, on the other hand, has every
10    motive to fabricate.   He is on trial.   He is an interested
11    witness as a matter of law as the judge will tell you.
12    Think about how he testified, how he conducted himself
13    during this trial, whether his story made sense against
14    everything else you know.   Andrea Weinbaum and Mr. Martoni,
15    they were acting like jerks.   On that video what you saw
16    they were acting like jerks to me.   Frank Martoni came after
17    me inside the elevator.   Frank Martoni came after the
18    defendant inside the elevator.   I only hit him one time and
19    this attacking bear who was grappling with me, that one time
20    just stopped him in his tracks and then we walked out of the
21    elevator together and then I walked back in and he just
22    stood there.   Does that make any sense?   Of course not.
23    And if they walked out of the elevator together, Ms.
24    Weinbaum would have seen it.   They didn't walk out together.
25    Mr. Martoni walked out alone after he had been struck four

1    stop him.  That is what we know about the defendant right

2    before he struck Frank Martoni and there is evidence that

3    his intent was to do something serious, as serious as the

4    tone of his voice and the anger in his body language.  The

5    actual assault itself.

6              We know that the defendant, what he intended

7    because of the number, the severity, and the placement of

8    the blows to Frank Martoni.  Four punches to the same eye

9    with the type of force it takes to break bones.  I asked him

10   on cross examination you hit him as hard as he could and he

11   said well, yeah, as close to it.  If I had gotten a running

12   start I probably could have hit him a little harder, so as

13   hard as I could from that position.  Remember, we are not

14   talking about premeditation, we are talking about what he

15   intended in that moment.  In that moment he was angrier than

16   hell that Frank wouldn't let him up.  What is your fucking

17   problem, Frank?  He wasn't trying to get Frank out of the

18   way, he didn't push him to get him out of the way or try to

19   juke him, he punched him four times; two times, BAM, BAM,

20   and then two more.  Remember defendant cross-examined Mr.

21   Martoni and he asked him are you sure it wasn't just one

22   punch.  Remember what he said.  Frank said no, I heard four

23   cracks.  Four cracks that correspond to the four different

24   fractures in Frank Martoni's face.

25              THE COURT:  Sustained.  Totally speculative.  Jury

PEOPLE'S SUMMATION                                page 229

1     is to disregard.  There is no testimony or evidence that

2     supports that different punches resulted in different

3     fractures.  Totally improper argument.

4           MR. ROONEY:  There were four blows, all four blows

5     to the same area, bones around the left eye.  That was not

6     the most logical place to hit Frank Martoni if the defendant

7     just wanted to get past him.  Frank Martoni had several

8     inches on the defendant.  The defendant hit Frank Martoni in

9     that spot over and over because he wanted to hurt him and

10   the defendant continued to hit Frank Martoni in that spot

11   because he wanted to injure him badly.  Just like a boxer

12   attacks his opponent's weak spot, the defendant hit once and

13   then struck again and again and again in that same spot.

14 And the human eye is delicate and vulnerable to injury.

15          THE COURT:  Sustained.

16          MR. ROONEY:  So each punch --

17          THE COURT:  That is not evidence in the case, you

18 can't consider it.

19          MR. ROONEY:  With each punch common sense tells us

20 that that area of Frank's, excuse me, of Frank Martoni's

21 face became more vulnerable, more likely to suffer serious

22 damage.

23          THE COURT:  Sustained.

24          MR. ROONEY:  And the defendant knew that.

25          THE COURT:  There is no evidence in the case that

1    supports that.

2         MR. ROONEY:  The defendant knew that where he had

3    hit he had hurt and he went after it again and again and

4    that's why it wasn't one punch to the face or one punch to

5    the stomach that might just have stunned Frank Martoni.  The

6    defendant didn't want to just stun Frank Martoni or knock

7    the wind out of him for a few seconds, his purpose was to

8    injure Frank and to injure him seriously and he did

9    everything within his power to do it.  He put every one of

10   those 176 pounds in his body into those four punches.  Bang,

11   bang, bang, bang.  He knew what the natural and probable

12   consequences of throwing punch after punch like that would

13   be.

14        The defendant testified he works out, he does

15   everything.  He knows what his body is capable of.  He knew

16   what the natural and probable consequences of throwing those

17   four punches with all that weight would be and he wanted to

18   throw those punches.

19        And how about what the defendant did after the

20   assault?  He ran.  He went up to the apartment, he locked

21   himself inside.  He didn't come down to see how Frank

22   Martoni was doing, he didn't call down to the front desk to

23   apologize, he didn't call 911 to get the guy help, he didn't

24   do any of these things because he knew exactly what had

25   happened to Frank Martoni and he didn't regret it.  He

1   doesn't regret it to this day, you can tell that from this

2   trial.

3          But you might be thinking maybe he didn't know it

4   was so bad.  Absolutely not.  You remember Officer

5   Farinaccio's testimony about the five minutes he stood at

6   the defendant's door before he came out.  The defendant

7   testified about it too.  Remember that?  Took so long

8   because the defendant knew he was in the wrong.

9          THE COURT:  Defendant had no obligation to open

10  his door, to come to the door.

11         MR. ROONEY:  He knew what he had done and he knew

12  that he was going to be in trouble.  It was no surprise when

13  the police knocked on his door because he knew how seriously

14  he had just beaten Frank Martoni.

15         Lastly, when you look at the results of someone's

16  actions to determine what that person intended, the injuries

17  that Frank Martoni suffered and their seriousness are

18  evidence of what the defendant intended.  You have the

19  pictures in evidence, you remember Frank Martoni's testimony

20  from Monday about all of the pain and all of the symptoms he

21  suffered, the vomiting, headaches, numbness to his face, the

22  list of ways in which his life was affected by those four

23  blows from the defendant.  That list goes on and on.  I am

24  not going to recount them now, but I would like to turn to

25  the medical records for a second.  I mentioned them several

1   the defendant does not mean that the defendant did not try

2   to make that happen.  He did.  The overwhelming evidence in

3   this case proves beyond a reasonable doubt that in that

4   moment when Frank Martoni tried to stop the elevator, the

5   defendant wanted to inflict serious physical injury and he

6   did.

7           THE DEFENDANT:  Objection.  There is nothing to

8   indicate --

9           THE COURT:  Overruled.

10          MR. ROONEY:  He wanted to inflict serious physical

11  injury and he took definitive steps with that goal in mind.

12  The natural and probable consequences of his actions of

13  those four blows with all of his weight were serious

14  long-lasting injuries.

15          THE COURT:  Members of the jury, I am also going

16  to remind you that there is no evidence at this trial as to

17  whether those bones break with minimal force, with

18  significant force, and you are not to speculate about that,

19  as to how much force was necessary to break those bones.

20          MR. ROONEY:  Defendant knew what he was doing and

21  he wanted it.  That is why he is guilty of attempted assault

22  in the second degree as well as a completed assault in the

23  third degree for just causing regular physical injury.  That

24  is not even an issue.

25          Now, if the evidence were so overwhelming you

1    known as self-defense. The defendant, however, is not

2    required to prove that he was justified. The People are

3    required to prove beyond a reasonable doubt that the

4    defendant was not justified. I will now explain our law's

5    definition of the defense of justification as it applies to

6    this case.

7              Under our law a person may use physical force upon

8    another individual when and to the extent that he reasonably

9    believes it to be necessary to defend himself or someone

10   else from what he reasonably believes to be the use or

11   imminent use of unlawful physical force by such individual.

12             The determination of whether a person reasonably

13   believes physical force to be necessary to defend himself or

14   someone else from what he reasonably believes to be the use

15   or imminent use of physical force by another individual

16   requires the application of a two-part test. That test

17   applies to this case in the following way:

18             First, the defendant must have actually believed

19   that Frank Martoni was using or was about to use physical

20   force against him or someone else and that the defendant's

21   own use of physical force was necessary to defend himself or

22   someone else from it.

23             Second, a reasonable person in the defendant's

24   position, knowing what the defendant knew and being in the

25   same circumstances, would have had those same beliefs. It

1          Jurors excused.

2              (WHEREUPON, THE JURY EXITS THE COURTROOM)

3              THE COURT:  You want to reserve your motions till

4     the date of sentence?

5              THE DEFENDANT:  Yes.

6              THE COURT:  And I have reserved on the first

7     count, so I am going to have to decide whether or not there

8     is sufficient evidence to support that, that verdict.

9              I was going to suggest six weeks.  You are going

10    to have to go to the Department of Probation tomorrow and

11    start a process with them and they are going to prepare a

12    presentence report that will make recommendations to me as

13    to what the sentence should be.  So that would be February

14    27th.  Is that a convenient date?

15             MR. ROONEY:  Your Honor, may I be heard on the

16    issue of bail?

17             THE COURT:  You can make an application.

18             MR. ROONEY:  Your Honor, I am not asking you to

19    remand the defendant, but I do think that some amount of

20    bail to ensure his return is necessary and appropriate in

21    this matter.  He is now a convicted felon in this state,

22    he's indicated on the stand that he no longer lives in the

23    state, he has ties throughout the country, and I think some

24    sort of ten thousand dollars bail would ensure that he

25    return to the state for his sentencing date.

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK)
                              S.S.:
COUNTY OF NEW YORK)

I, MITCHELL TAEBEL, being duly sworn, deposes and says:

That I have on this 22nd day of September, 2013 placed and submitted in
the United States Postal Service receptacle in New York, New York, a
Supplemental Affidavit in support of the Motion to Vacate Judgments
440.10, to be mailed to the following parties in the above action:

DISTRICT ATTORNEY'S OFFICE
New York County, Manhattan
1 Hogan Place Rm 854
New York, Ny 10013

SUPREME CRIMINAL COURT
ATTN: Motion Clerk Part 21
111 Centre st.
New York, NY 10013

Respectfully Submitted,

_____
MITCHELL TAEBEL

Sworn to before me this
22nd day of September, 2013

_____
NOTARY PUBLIC

## AFFIDAVIT OF SERVICE

**STATE OF NEW YORK)**

S.S.:

**COUNTY OF NEW YORK)**

I, MITCHELL TAEBEL, being duly sworn, deposes and says:

That I have on this 22nd day of September, 2013 placed and submitted in
the United States Postal Service receptacle in New York, New York, a
Supplemental Affidavit in support of the Motion to Vacate Judgments
440.10, to be mailed to the following parties in the above action:

**DISTRICT ATTORNEY'S OFFICE**
**New York County, Manhattan**
**1 Hogan Place Rm 854**
**New York, Ny 10013**

**SUPREME CRIMINAL COURT**
**ATTN: Motion Clerk Part 21**
**111 Centre st.**
**New York, NY 10013**

Respectfully Submitted,

**MITCHELL TAEBEL**

Sworn to before me this
22nd day of September, 2013

NOTARY PUBLIC

JODIE K ALEXANDER
Notary Public - State of New York
NO. 01AL6251224
Qualified in Westchester County
My Commission Expires

SR - 348

# Exhibit C

330 Motion to Vacate Charge

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 21
----------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

-against-                                              NOTICE OF MOTION
                                                      TO SET ASIDE VERDICT

                                                      Indictment No.: 2536-2012

MITCHELL TAEBEL,
                              Defendant.
----------------------------------------------------------------X

PLEASE TAKE NOTICE, that, upon the annexed affirmation of BRUCE R. CONNOLLY, ESQ., and upon all prior proceedings had herein, the undersigned will move this Court, at New York County Supreme Court, 111 Centre Street, Part 21, New York, NY, before the Honorable Michael R. Sonberg, on the 1st day of May, 2013, at 9:30 o'clock in the forenoon of that day, or as soon thereafter as counsel may be heard, to set aside the verdict, or a portion thereof, in the above-captioned case:

A.  Pursuant to Criminal Procedure Law ("C.P.L.") § 330.30(1), setting aside the verdict, due to errors occurring at and before trial;

B.  Granting such other and further relief as this Court deems just and proper.

Dated: March 25, 2013

                                          Yours,

                                          RAISER & KENNIFF, P.C.
                                          Attorneys for Defendant
                                          By:  Bruce R. Connolly
                                          87 Walker Street, 2d Floor
                                          New York, NY  10013
                                          (212) 274-0090

TO:    Kevin Rooney, ADA
       1 Hogan Place
       New York, NY 10013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 21
-------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                                            AFFIRMATION IN
                                            SUPPORT OF
                                            CPL § 330.30(1) MOTION
   -against-
                                            Indictment No.: 2536-2012

MITCHELL TAEBEL,
                          Defendant.
-------------------------------------------------------------------X

STATE OF NEW YORK    )
                            S.S.:
COUNTY OF NEW YORK  )

      BRUCE R. CONNOLLY, an attorney duly admitted to practice before the Courts of the State of New York, under penalty of perjury, hereby affirms, based upon personal knowledge and based on matters occurring on the record at trial, that the following statements herein are true, except as to those facts stated upon information and belief which are believed to be true:[1]

     1.   That he is an attorney with the firm of RAISER & KENNIFF, P.C., retained to represent defendant, MITCHELL TAEBEL, in the above-entitled action.   This Affirmation is made in support of the relief requested in defendant's Notice of Motion.

     2.   The defendant was indicted on or about June 2, 2012 and charged with one count of Attempted Assault in the Second Degree, in violation of Penal Law § 110/120.05, one count of Assault in the Third Degree, in violation of Penal Law § 120.00, and one count of Criminal Trespass in the Second Degree, in violation of Penal Law § 140.15. Jury trial began on January 9, 2013 and continued through January 16,

---

[1] The sources of which are my review of the trial transcripts, review of the court file, and conversations with the defendant. Statements as to case law are based upon legal research.

2013.   The Defendant was convicted of the two assault charges and acquitted of the criminal trespass charge.

3.   The following errors, detailed in the attached memorandum of law, occurred on the record at trial, resulting in prejudice to the defendant, and which require reversal of the Defendant's convictions.

4.   Annexed hereto as Exhibit "A" are the relevant portions of the trial transcripts cited in the memorandum of law.  Due to the voluminous nature of the transcript, only the salient pages are included.

5.   No previous request for the relief sought herein has been made.

WHEREFORE, your deponent respectfully requests this Court grant an order setting aside the verdict and for such other relief as may be deemed appropriate.

Dated: March 25, 2013
        New York, New York

By: _____
        Bruce R. Connolly, Esq.

RAISER & KENNIFF, P.C.
87 Walker Street, 2d Floor
New York, New York 10013
(212) 274-0090
*Attorneys for Defendant*

3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,          :
                                                                          :
                                                                          :
          - against –                                            :          Ind. No.: 2536-2012
                                                                          :
MITCHELL TAEBEL,                                          :
                                                                          :
                          Defendant.                           :
------------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO SET ASIDE THE VERDICT


**RAISER & KENNIFF, P.C.**

Bruce R. Connolly, Esq.
87 Walker Street, 2d Floor
New York, New York  10013
(212) 274-0090

*Counsel for Defendant*

TO:    A.D.A. Rooney
          New York County District Attorney
          One Hogan Place
          New York, NY 10013

4

**I.    Legally Insufficient Evidence**

Pursuant to C.P.L.§ 330.30, "At any time after rendition of a verdict of guilty and before sentence, the court may, upon motion of the defendant, set aside or modify the verdict or any part thereof upon the following grounds: (1) Any ground appearing in the record which, if raised upon an appeal from a prospective judgment of conviction, would require a reversal or modification of the judgment as a matter of law by an appellate court." *Id.*  A conviction may be set aside if the evidence is legally insufficient or inadequate, as a matter of law, to prove guilt beyond a reasonable doubt. *See, People v. Carter,* 63 N.Y.2d 530; *People v. Hakim-Peters,* 92 A.D.3d 1030.  In fact, if valid grounds for the C.P.L. § 330.30 motion are raised, a trial court may set aside the verdict even if the evidence of guilt is legally sufficient. *See, People v. Ventura,* 66 N.Y.2d 693. The standard for determining legal sufficiency is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Carthrens,* 171 A.D.2d 387.

**A. The Felony Conviction Must be Set Aside**

The statute charged in count one of the indictment is Attempted Assault in the Second Degree.  Penal Law § 120.05, states: A person is guilty of assault in the second degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person. *Id.*  Penal Law § 110.00 states: "A person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime." *Id.*  The element of "serious physical injury" is defined in Penal Law § 10.00(10): physical injury which creates a substantial risk of death, or which causes death or serious and protracted

5

disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ. *Id.*

A rational juror, after hearing the evidence in this case, could not have found the essential elements of the felony charge beyond a reasonable doubt. It was never proven beyond a reasonable doubt that Mr. Taebel (the "Defendant") intended to attempt to cause serious physical injury to Mr. Martoni (the "complainant.") According to the Defendant, he had an unfortunate encounter with the complainant, a doorman at the building where he lived. When the complainant refused to allow the Defendant entry into the building, words were exchanged. Upon information and belief, when the Defendant attempted to enter the elevator to go to his apartment, the complainant struck him first, and the Defendant acted in self-defense with one punch to complainant. The physical altercation was not captured by video surveillance or by other eyewitness, so the jury heard two conflicting versions from only the participants.

### 1. The Defendant testified that he punched the complainant one time in self-defense and the evidence did not prove otherwise.

The complainant testified that he received two shots to his left temple (39: 11-12)[2] and then two more shots to the same spot (39:20). Not only is this testimony uncorroborated but it directly contradicts the Defendant's testimony below:

> And once inside the elevator he continued, that is when he, like, lost it, like he was, like, you know, he just lost it and started attacking me and it turned into, like, a frantic grabbing match. And I got hit in the face in the middle of it and, you know, I got him off me once, but he just came back at me like faster and harder and he just wouldn't stop. And being in the elevator I really couldn't back up, I couldn't retreat, that wasn't even an option at that point. So, as I said, I did get hit, I had, a bloody lip....So, I mean, I tried to, like, get him off me, but, you know, he is a

---

[2] The citations to the transcript refer to a 294-page document that the Defendant received shortly after the trial. The first number listed is the page of this document and the second number listed is the line on the page. Annexed hereto as Exhibit "A" are the relevant portions of the trial transcripts cited in this memorandum of law. Due to the voluminous nature of the transcript, only the salient pages are included.

big, heavy guy and I didn't have a lot of room to move around.  So anyways, I struck him and that is what I had to do to get him off me and so that was, that is what happened.  And after - - and I immediately stopped, I only struck him once...(169:22 to 170:18)

Although Assistant District Attorney Rooney ("the Prosecutor") attempted during summation to argue that there was evidence that four punches corresponded with the four fractures to the complainant's face, he was repeatedly admonished by the Court for arguing facts not in evidence.[3]  Besides the Prosecutor's improper argument, this aspect of which the jury was directed to disregard, and the complainant's testimony, there was no evidence to refute the Defendant's version that he acted in self-defense with only one punch.

### 2.   The evidence did not establish that the Defendant had the requisite intent to attempt to cause serious physical injury to the complainant

Most cases that discuss felony assaults involve incidents where defendants used weapons or dangerous instruments.  The cases that involve weaponless assaults under P.L. §120.05(1) describe fact patterns where a defendant's actions are so egregious that the intent to cause serious physical injury is abundantly clear.  Courts have affirmed convictions of felony assaults and found the requisite intent in the following cases.  *See, People v. Martinez*, 224 A.D.2d 254 [where a defendant punched a victim in the jaw and then punched him four or five times with all his might after the victim lost consciousness and fell to the ground]; *People v. Wheeler*, 268 A.D.2d 448 [where a defendant repeatedly punched a victim in the face, who suffered a broken nose, had two teeth knocked out and a third tooth pushed into her gums, and was rendered unconscious]; *People v. Crawford*, 200 A.D. 2d 683 [where a defendant had punched and kicked a

---

[3] This will be discussed in the "Prosecutorial Misconduct" section of this Memorandum.

victim who had fallen to the floor]; *People v. Dosunmu*, 267 A.D. 2d 320 [where the evidence, including medical testimony, clearly established that while a co-defendant was punching a victim, defendant ran over, punched the victim and then held him around the waist while the co-defendant continued to hit him in the face]; *People v. Cruz*, 267 A.D.2d 319 [where a defendant punched a victim to the ground and continued to repeatedly punch him in the face after observing him bleeding from his nose, mouth, and ears].

While courts have upheld felony assault convictions in cases involving particularly brutal beatings, the assaults described above differ substantially from the facts of this case. The Defendant testified that he hit the complainant one time in self-defense. Courts have held that a single punch is insufficient for the requisite intent to inflict serious physical injury. *See, In Matter of Andre D.*, 182 A.D.2d 1108. Where courts have found a single punch sufficient to evidence an intent to cause serious physical injury, it has been under particularly egregious circumstances. *See, People v. Angelo M.*, 231 A.D.2d 925 [where defendant struck the victim with sufficient force to knock him unconscious, break his jaw and cheekbone, shatter his dentures and cause a concussion that resulted in an accumulation of blood in the victim's brain]. The extent of the complainant's injuries will be discussed below, but they were nowhere near the injuries suffered in *Angelo M.* and the other cases cited above. It is worth noting that the complainant returned to his post immediately after the incident and waited approximately one month to have surgery.

Courts have cautioned that intent may be "inferred from the totality of conduct of the accused" in determining whether a defendant intended to cause serious physical injury. *People v. Mahoney*, 6 A.D.3d 1104 (*citing People v. Mike*, 283 A.D.2d 989). In

*Mahoney*, the victim fell to the ground as a result of the first blows inflicted by defendant, who then repeatedly kicked the victim in the head as he lay defenseless. "[T]he eyewitness accounts of defendant's . . . fatal beating of the victim, coupled with the medical testimony, clearly established that the defendant intended to cause serious physical injury to the victim." *Id.* at 1104.

Here, the totality of the defendant's conduct must be taken into account. The Defendant was denied entry to his apartment a few minutes prior to the physical encounter. The Defendant attempted to discuss the matter with both the complainant and Ms. Weinbaum. He did not strike either of the building employees when they denied him entry; rather, he explained that he lived there and had been living there for some time without incident. The encounter became physical minutes later, where the only eyewitnesses were the two participants, who offer contradicting accounts. The Defendant punched the complainant only because the complainant attacked first. The Defendant did not beat the complainant unconscious. He did not punch and kick him while he lay defenseless on the ground. Once the complainant exited the elevator to return to his post, the Defendant did not run after him and start hitting him again. Rather, he punched him one time to subdue a much larger man who initiated the physical attack.

Even if this Court were to credit the complainant's version of the facts (that he was hit four times) rather than the Defendant's version (that he was hit one time), four punches, absent any other aggravating circumstances, do not evidence the intent necessary to sustain the felony charge in this case. The Kings County Supreme Court found that a defendant did not intend to cause serious physical injury despite the fact that he knew the victim suffered from a heart condition and still proceeded to punch him

multiple times in the face and chest during a road rage incident. *See, People v. Aponte*, 82 Misc. 2d 283.

Viewing the evidence in the light most favorable to the People (*People v. Ficarrota*, 91 N.Y.2d 244, *People v. Contes*, 60 N.Y.2d 620, *People v. Acosta*, 80 N.Y.2d 665), a rational trier of fact could not conclude that the Defendant intended to attempt to cause serious physical injury to the complainant by punching him during their altercation. As a rational trier of fact could not reasonably find an essential element of the charged offense, the felony conviction must be overturned.

3. **The evidence did not establish that the complainant suffered serious physical injury**.

While actual proof of serious physical injury is not an element of attempted assault in the second degree, the injuries suffered by the complainant are relevant to the extent that they are not indicative of an intent to cause serious physical injury. The Defendant, by punching the complainant, did not engage in conduct which tended to effect the commission of the felony assault charge. The serious physical injury threshold is a substantial one and not every injury will qualify. For example, the following cases, where the injuries were more substantial than this complainant's, held that the serious physical injury threshold was not met: *See, People v. Ham*, 67 A.D.3d 1038 [where victim was shot and had a "lump" in his leg]; *People v. Horton*, 9 A.D.3d 503 [where victim was shot in the neck and bullet fragments were not removed]; *People v. Trombley*, 97 A.D.3d 903 [where victim suffered two lacerations to his face from defendant striking him with his fist, which resulted in two scars on the victim's face]; *People v. Daniels*, 97 A.D.3d 845 [where victim was stabbed in the head with a knife, and suffered a concussion and residual headaches, which eventually subsided]; *People v. Nimmons*, 95

A.D.3d 1360 [where victim suffered gunshot wounds to the chest]; *People v. Tucker*, 91 A.D.3d 1030 [where victim suffered eight stab wounds]; *People v. Gray*, 30 A.D.3d 771 [where victim was shot and thirty-two pellets became lodged in his arm, shoulder, and chest but all symptoms were resolved in less than four months]; *People v. Jerreld*, 19 Misc.3d 595 (citing *People v Rollins*, 115 A.D.2d 838 and *People v Askerneese*, 93 N.Y.2d 884) [where a two-year-old victim suffered a broken femur when defendant threw him onto a bed and the fracture required him to be placed in a body cast for six to eight weeks; court stressed that a mere fracture is not enough to meet the Penal Law definition of serious physical injury and that proof of a fracture, without more, does not satisfy that element of the crime]; *People v. Phillip*, 279 A.D.2d 802 [where victim suffered a broken jaw causing six to eight weeks of missed work, leaving victim unable to eat solid food for two months, with some pain two years later].

Moreover, the First Department found that evidence was insufficient to establish that a victim suffered serious physical injury as a result of an attack, where a fracture to the orbital socket of the victim's eye was surgically repaired, and the victim suffered no lasting ill effects beyond an occasional twitching of his eye. *See, People v. Sudol*, 89 A.D.3d 499.

If serious physical injuries were not sustained in cases where victims were stabbed and shot, it is arguable that the Defendant could not have had the requisite intent to cause serious physical injury simply by one punch. According to his testimony and the surveillance video in evidence, the complainant returned to his post and continued opening doors immediately after the physical encounter. When he went to the hospital later in the day, the only treatment he received was painkillers and anti-nausea medication (52:13-15). He did not stay overnight at the hospital. (52:16-17). The

complainant described his limitations immediately following the incident, which included not going to work, no exertion, bed rest, no sudden turns, not leaning over too fast, not sneezing through his nose, not blowing his nose, and only eating soft foods  (53:7-16). His sleep was affected in that he was able to enjoy six hours each night rather than seven. (53:24 to 54:3).

It is worth noting here, as did the Court during trial, that the complainant suffered his injury on September 2, 2012, and did not have his surgery until the end of September (54:21-23).  The reason for the delay was that the complainant had to go through Workers Compensation (55:1-3). In regards to this long lapse, the Court stated, "They must have been fairly confident that the risk of that happening here was remote because Workers' Comp or not, no one sits around with a fractured orbital for a month and waits for surgery…" (123:8-11). The complainant stated that the pain he was suffering went away, just as the doctor had predicted it would (55:17-18).   The complainant's limitations following surgery were no heavy lifting (55:23).

Since the complainant did not suffer serious physical injury, it is much less likely that the Defendant intended such serious physical injury.

### 4. This Court expressed doubt about the felony charge several times throughout the trial

The trial evidence was insufficient as a matter of law to establish guilt of the felony charge beyond a reasonable doubt, and the Court alluded to this three specific times during the trial.  The first occurred after the People rested their case:

> I am going to reserve with respect to the first count.  I think there is a real question as to whether there is any proof that would suggest that Mr. Taebel's intention was to cause serious physical injury, so I am going to reserve as to that (142:17-21).

The second occurred just before closing arguments:

> I am going to give the jury all three counts. I am reserving whether or not there is sufficient evidence to support a verdict on the first count, but I am going to let them decide it. If they acquit you, then there is no issue.  If they convict you, then I will decide whether or not there was sufficient evidence to support the verdict of guilty.  That is the only one as to which I have a question.  I don't think – my gut tells me there is probably not enough evidence there to support an inference that the intention was to cause serious physical injury (208:8-17).

The third occurred following the jury's verdict:

> And I have reserved on the first count, so I am going to have to decide whether or not there is sufficient evidence to support that, that verdict (286:6-8).

The Defendant respectfully requests that the Court revisit its consternation immediately after hearing the testimony in the case and find that there was not sufficient evidence to support the guilty verdict on the felony assault count.

II.      Prosecutorial Misconduct

**A. Both convictions must be set aside due to many instances of prosecutorial misconduct throughout the trial.**

Reversal is mandated when the conduct of the prosecutor has caused such substantial prejudice to the defendant that he has been denied due process of law.  In measuring whether substantial prejudice has occurred, one must look at the severity and frequency of the conduct, whether the court took appropriate action to dilute the effect of that conduct, and whether review of the evidence indicates that without the conduct the same result would undoubtedly have been reached. *People v. Morrice*, 61 A.D. 3d 1390, 1392.

Here, the conduct of the Prosecutor was detrimental to a fair trial of this case. During the course of the trial, there were instances where the Prosecutor acted and spoke in a condescending way toward the Defendant.  More importantly, during his closing

argument, the Prosecutor attempted to shift the burden of proof and referred to facts not in evidence. This occurred in the presence of the jury and was captured on the record. The Prosecutor's conduct was intended to make an already strong advantage against a *pro se* defendant even more one-sided. This unacceptable conduct undermined the Defendant's credibility in front of the jurors and denied him a fair trial.

The First Department, in *People v. Collins*, held that the catalogue of prosecutorial improprieties deprived defendant of his right to a fair trial. 12 A.D. 3d 33, 34. The Court stated that while any particular instance, standing alone, would not necessarily justify reversal, the cumulative effect of the remarks served to deprive defendant of a fair trial. *Id.* at 36 (*citing People v. Calabria*, 94 N.Y. 2d 519). *Collins* speaks of the following errors, all which were also committed here by the Prosecutor.

**1.   The Prosecutor characterized the Defendant as a liar**

"A prosecutor exceeds the bounds of legitimate advocacy by resorting to name calling, such as characterizing the defendant as a liar. *Collins, supra*, at 37 (*citing People v. Shanis*, 36 N.Y.2d 697; *People v. Dowdell*, 88 A.D.2d 239). In *Collins*, the prosecutor said that the defendant's motive to lie is gigantic and characterized his story as unbelievable. Here, the Prosecutor used the same type of language when he said, "Now, the defendant, on the other hand, has every motive to fabricate. He is on trial. He is an interested witness…" (226:9-11) and when he referred to the Defendant's version of the facts as ridiculous (224:22).

During the Prosecutor's cross-examination of the Defendant, he asked, "[D]o you need some more water, sir?" (189:21) and stated that he was looking out for Mr. Taebel (190:2-3). The Court admonished the Prosecutor for that statement, struck it from the record, and ordered the jury to disregard. This comment by the Prosecutor implied an

accusation that the Defendant was lying on the stand.  While the Court protected the Defendant on the record, the jury was left with the impression that he was speaking untruthfully and needed water to calm his nerves.

Another example of the Prosecutor's sarcasm occurred when he asked the Defendant about using a Bally's fitness club in Los Angeles.  The Defendant answered, "I used a Bally's in Los Angeles.  Not while I was living in New York."  (179:11-12).  The Prosecutor responded, "Obviously.  Even you can't be in two places at once."  (179: 13).  The Court sustained a sua sponte objection, directed that the comment be stricken from the record, and directed the jury to disregard.

These three examples are part of a pattern of misconduct by the Prosecutor that occurred throughout the course of the trial and when viewed in a cumulative effect, together with the more serious incidents cited below, deprived the Defendant of a fair trial.

2.      **The Prosecutor vouched for the credibility of the complainant**

A prosecutor may not vouch for the credibility of the People's witnesses.  *Collins, supra,* at 37 (*citing People v. Bailey*, 58 N.Y.2d 272).  In *Collins*, the prosecutor used the following language:

> "You met the undercover officer...Remember how forthright he was...Remember how credible he was and ask yourself, is he going to take the stand and perjure himself, commit a crime for this case?... If you are going to credit the undercover, think about how he appeared to you on the stand and what his possible motives to lie would be."  *Id.* at 37-38.

Here, the Prosecutor used very similar language:

> "And if the defendant's right, if Frank Martoni started it, would Frank Martoni lie about it?...Lying under oath is a big thing.  What big reason would Frank Martoni have to do that in this case?  Frank Martoni has no motive to lie in this case. ...Frank Martoni's testimony was credible because you got to evaluate him on the stand.  You saw how he answered

questions from me and from the defendant, how he responded to the judge, how he admitted when he didn't remember something. (225:21 to 226:8).

This is a clear example of the Prosecutor vouching for the credibility of the complainant, which the *Collins* court stressed was not permissible.

### 3.    The Prosecutor attempted to shift the burden of proof

A prosecutor may not attempt to shift the burden of proof by implying that the defendant has an obligation to introduce evidence. *Collins, supra*, at 38 (*citing People v. Ortiz*, 116 A.D.2d 531). Here, this Court made clear in its charge to the jury that the Defendant "is not required to prove that he was justified. The People are required to prove beyond a reasonable doubt that the defendant was not justified." (255:1-4). However, the Prosecutor, in his summation, stressed exactly the opposite:

> This was never self-defense and everyone in here knows it, including and especially the defendant. That is why there are no pictures or medical records documenting the split lip that he claims, the split lip that Officer Farinaccio never saw. All you have is the defendant saying that Frank Martoni struck him and caused him to have a split lip and that he wished he had taken a picture of it. Don't you think that would have been important? Don't you think after being arrested he might say, hey, I should probably document this injury that I suffered at the hands of that huge man? Especially considering this is someone who is very careful about details. He wants to get everything right. He wants to tape the police officers when they come to his door but he doesn't take a picture of the injury that he suffered?
> (222:14 to 223:3)

The Prosecutor was suggesting that the Defendant was obligated to produce photographs to support his theory of justification. This is clear evidence of an attempt to shift the burden of proof, which may have been a factor in the jury's deliberations and which may have supported their decision to convict the Defendant of the assault charges.

### 4. The Prosecutor referred to facts not in evidence

A prosecutor may not refer to matters not in evidence or call upon the jury to draw conclusions that cannot fairly be inferred from the evidence. *Collins, supra*, at 39-40. (*citing People v. Ashwal*, 39 N.Y.2d 105). In *Collins*, the prosecutor strayed outside the four corners of the evidence and argued something without any evidentiary basis. Similarly, in his closing argument in this case, the Prosecutor stated specific medical facts that were not in evidence, and this argument was likely to have a lasting effect on the jury. This was one of the last things the jury heard before they started deliberations. The Prosecutor was speaking about the serious physical injury threshold, and apparently understanding this was the weakest portion of his case and facing an acquittal on the felony, he attempted to offer the jury facts that were not in evidence, pursuant to the following dialogue:

> A.D.A. Rooney: "Frank said no, I heard four cracks. Four cracks that correspond to the four different fractures in Frank Martoni's face (228: 22-24).

> The Court: Sustained. Totally speculative. Jury is to disregard. There is no testimony or evidence that supports that different punches resulted in different fractures. Totally improper argument (228:25 to 229:3).

After just having made a "totally improper argument" according to the Court, the Prosecutor did not stop there. He continued to push the issue in the hopes that that he could slip these improper arguments to the jury past an untrained *pro se* defendant:

> A.D.A. Rooney: The defendant hit Frank Martoni in that spot over and over because he wanted to hurt him and the defendant continued to hit Frank Martoni in that spot because he wanted to injure him badly. Just like a boxer attacks his opponent's weak spot, the defendant hit once and then struck again and again and again in the same spot. And the human eye is delicate and vulnerable to injury (229:8-14).

> The Court: Sustained (229:15)

A.D.A. Rooney: So each punch - - (229:16)

The Court: That is not evidence in the case, you can't consider it. (229:17-18)

A.D.A. Rooney: With each punch common sense tells us that that area of Frank's, excuse me, Mr. Martoni's face became more vulnerable, more likely to suffer serious damage (229:19-22)

The Court: Sustained (229: 23).

A.D.A. Rooney: And the defendant knew that (229:24).

The Court: There is no evidence in the case that supports that. (229:25 to 230:1).

The Prosecutor, despite the Court continually admonishing him to stop making arguments of this kind, kept returning to them. The Prosecutor was determined to get these arguments in front of the jury, even while the Court directed him not to. He tried one last time, toward the end of his closing argument, and the Court catches it again:

A.D.A. Rooney: He wanted to inflict serious physical injury and he took definitive steps with that goal in mind.   The natural and probable consequences of his actions of those four blows with all of his weight were serious long-lasting injuries (234:10-14).

The Court: Members of the jury, I am also going to remind you that there is no evidence at this trial as to whether those bones break with minimal force, with significant force, and you are not to speculate about that, as to how much force was necessary to break those bones (234:15-19).

**5. The Prosecutor drew inflammatory conclusions**

A prosecutor should not seek to lead the jury away from the issues by drawing irrelevant and inflammatory conclusions which have a decided tendency to prejudice the jury against the defendant. *Collins, supra,* at 40 (*citing People v. Ashwal, supra*). The Prosecutor spoke of the Defendant's consciousness of guilt and argued that the jury should consider the fact that the Defendant took a long time to open the door when the

police rang his doorbell (231:3-8). The Court calls attention to this improper statement by instructing the jury, "Defendant had no obligation to open his door, to come to the door." (231:9-10).

Finally, the Prosecutor tells the members of the jury that they must decide the two questions that every criminal jury in this country in our history is asked to answer: "Were the crimes that are charged actually committed and is the defendant the person who committed it?" (216:15-19). The Court immediately interrupts the Prosecutor and instructs the jury that the actual question they need to decide is "did the People meet their burden of proof beyond a reasonable doubt." (216: 20-21).

It is improper for the prosecutor to use inflammatory language which appeals to the sympathies and fears of the jury, to make remarks which attempt to shift the burden of proof from the People to the defendant, and to lead the jury away from the issues by mischaracterizing the defense. *People v. Ortiz*, 116 A.D.2d 531. The First Department held that reversal was mandated in view of the combination of these errors and the obdurate pattern of inflammatory remarks throughout the prosecutor's summation. *Id.* at 532.

In *Collins*, the court found that the prosecutor's argument that was unsupported by evidence exceeded the bounds of proper summation. It also found that the trial court's intercession was not sufficient to ameliorate the harm. The Court stated, "Evenhanded justice and respect for the fundamentals of a fair trial mandate the presentation of legal evidence unimpaired by intemperate conduct aimed at sidetracking the jury from its ultimate responsibility – determining facts relevant to guilt or innocence." *Collins, supra*, at 41-42 (*quoting People v. Calabria*, 94 N.Y.2d 519). "We cannot assume that, absent all the prosecutor's improprieties in summation, defendant's version of events

would not have carried the day." *Id.* at 42 (*citing People v. Bailey,* 58 N.Y.2d 272).  The *Collins* court reversed the judgment convicting the defendant and remanded for a new trial.

"Although some of the Assistant District Attorney's remarks were not objected to, and the trial court did give curative instructions as to others, the cumulative effect of all the errors requires reversal of the conviction and a new trial, particularly in light of the less than overwhelming evidence of the defendant's guilt." (*People v. DeJesus,* 137 A.D.2d 761, 762-63).  This trial "was permeated from beginning to end by the prejudicial conduct of the prosecutor.  He repeatedly asked improper questions, disregarded the trial court's rulings, intentionally made unwarranted asides, denigrated defendant and defense counsel in the presence of the jury, improperly vouched for the credibility of the People's witnesses...." *People v. Grice,* 100 A.D.2d 419, 420.  "Reversal is warranted because, regardless of the quantum and nature of the People's proof, the threshold of reversible error was unmistakably crossed in this case. Even if the proof had been overwhelming, the cumulative effect of numerous errors deprived defendant of [his] fundamental right to a fair trial" (*People v. LaDolce,* 196 A.D.2d 49, 53).  Here, the cumulative effect of all the above actions of the Prosecutor requires reversal of the Defendant's conviction.

The Defendant respectfully requests that the Court vacate both assault convictions because the cumulative effect of the above-mentioned errors deprived him of his fundamental right to a fair trial.

## CONCLUSION

For the foregoing reasons, Defendant's Motion should be granted in its entirety.

Dated: New York, New York
　　　　 March 25, 2013

Yours,

RAISER & KENNIFF, P.C.
Attorneys for Defendant
By: Bruce R. Connolly
87 Walker Street, 2d Floor
New York, NY 10013
(212) 274-0090

TO:　A.D.A. Kevin Rooney
　　　 1 Hogan Place
　　　 New York, NY 10013

# EXHIBIT "A"

The 330 Transcripts have been consolidated with the Transcripts of of the 440.10

Case No. 2536-2012                           Year

===============================================================

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 21


THE PEOPLE OF THE STATE OF NEW YORK,

-against-


MITCHELL TAEBEL,
                        Defendant.

===============================================================


### C.P.L. § 330.30 MOTION

===============================================================


**RAISER & KENNIFF, P.C.**
Attorneys for Defendant
87 Walker Street, Second Floor
New York, New York 10013
(212) 274-0090


===============================================================


Pursuant to 22 NYCR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.

Dated: _3-25-13_     Signature _____

                     Print Signer's Name _Bruce Connolly_

===============================================================

# Exhibit D

*Complaint*

*DA Report*

*Police Report*

*Medical Report*

*Letter of Indictment*

# CRIMINAL COURT OF THE CITY OF NEW YORK
## COUNTY OF NEW YORK

Page 1 of 1

THE PEOPLE OF THE STATE OF NEW YORK          MISDEMEANOR
-against-

1. Mitchell Taebel (M 25)          ECAB #
                                   1261635

                                   Defendant.

Police Officer Michael Farinaccio, shield 16315 of the 019 Precinct, states as follows:

On September 2, 2011, at about 12:30 hours inside of 1755 York Avenue in the County and State of New York, the Defendant committed the offenses of:

1.  PL120.00(1)     Assault in the 3rd Degree-DNA-Eligible MISD
                    (1 count)
2.  PL240.26(1)     Harassment in the Second degree
                    (1 count)

the defendant, with intent to cause physical injury to another person, caused such injury to another person; and the defendant, with intent to harass, annoy and alarm another, subjected that person to physical contact and attempted and threatened to do the same.

The offenses were committed under the following circumstances:

Deponent states that deponent is informed by Frank Martoni, of an address known to the District Attorney's Office, that informant observed defendant strike informant about informant's face with defendant's closed fist, thereby causing a laceration, swelling, bruising, and substantial pain to informant's left eye.

False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law.

_____          _____
Deponent                          Date and Time

ACT 5 Version 4.3.5 Created on 09/16/11 9:28 AM

| Reasons: | | Reasons: | |
|---|---|---|---|
| . *OSR?*<br>. *Bailts* | | | |

| Bail Req: | Bail Set: | Bail Req: | Bail Set: |
|---|---|---|---|
| *$500* | *n.OR* | | |

## ASSAULT 3 - D PUNCHES BUILDING DOORMAN IN THE LEFT EYE (FACTS CONTINUED ON SUPPLEMENTAL PAGE)

-RELATIONSHIP: Defendant's girlfriend lives in a building at 1755 York Ave, Apt. 27A. D has key to GF's apartment. D stays with GF regularly.
-CV is the building doorman for 30 years and has seen D at building in the past
-Building has a policy that doesn't allow guests to enter unless they are on a list when the tenant's aren't home
-D arrives at front door and CV informs D that he is not permitted to enter the building
-D proceeds to walk towards elevator, CV tries to stop D by standing in front of CV at the elevators
-INJURIES: At this time, D punches CV in the left eye with a closed first causing a laceration, brusing, and swelling to CV's eye

| Statements △1:<br>See Supp | Statements △2: |
|---|---|

| ID △1: | ID △2: |
|---|---|

| Date: *10/11* | Part: *PAT* | Special Instructions | Notice Checklist | D E F 1 | D E F 2 |
|---|---|---|---|---|---|
| ADA: *KINGO* | | Arraignment Notes: | 710.30(1A) | ☑ | |
| | | | 710.30(1B) | | |
| Judge: *SCHECTER* | | | 190.50(5A) | | |
| | | | Cross G.J | | |
| Court Reporter: *J. JOHNSON* | | | OTP | | |
| | | | 170.20 | | |
| Adj. Date: *11/22* | Adj Part: *E* | | Request TOP | ☑ | |
| Reasons:<br>*GRB* | | *11/22/E* | F & S Supp Dep. | | |
| | | | 450.10 48 Hour | | |
| | | | 450.10 15 Day | | |
| | | | Surety | | |



# New York City Police Department
## Omniform System - Arrests

**RECORD STATUS: ARR PRC CMPL** | **Arrest ID: M11677089 - M**

**Arrest Location:** INSIDE OF 1755 YORK AVENUE | **Pct: 019**

**Arrest Date:** 09-02-2011   Processing Type: D A T

**Time:** 12:46:00   DCJS Fax Number: MP022715

Sector: M   Special Event Code: -
DAT Number: 0

Stop And Frisk: NO   Return Date: 0000-00-00

Serial #: 0000-000-00000

**COMPLAINTS:** | Arrest #: M11677089

| COMPLAINT NUMBER | REPORT DATE | RECORD STATUS | OCCUR DATE | OCCUR TIME |
|---|---|---|---|---|
| 2011-019-05662 | 2011-09-02 | Reserved # for Arrest | 2011-09-02 | 12:50 |

**CHARGES:** | Arrest #: M11677089

| CHARGE | ATTEMPT? | LAW CODE | CLASS | TYPE | COUNTS | DESCRIPTION |
|---|---|---|---|---|---|---|
| TOP | No | PL 120.00 01 M | A | | 1 | ASLT WINT CAUSES PHYS INJURY |

| DWI Arrest from: | # Injured: 00 | # Fatalities: 00 | Test Given: | B.A.C.: | Reason Not Forfeit: |
|---|---|---|---|---|---|

**DETAILS:** | Arrest #: M11677089

AT T/P/O THE DEFT GOT INTO A DISPUTE WITH THW C/V THE DEFT GOT MAD AND PUNCHED THE C/V IN FACE CAUSING INJURY TO LEFT EYE THE C/V WAS TREATED ON SCENE BY EMS #5514 THEN TAKEN TO LENOX HILL HOSP TO BE CHECKED A/O DID NOT WITNESS SGT ROMANCE ON SCENE

**DEFENDANT: TAEBEL, MITCHELL T** | NYSID #: | Arrest #: M11677089

| | | |
|---|---|---|
| Nick/AKA/Maiden: | Height: 5FT 10IN | Order Of Protection: NO |
| Sex: MALE | Weight: 170 | Issuing Court: |
| Race: WHITE | Eye Color: GREEN | Docket #: |
| Age: 25 | Hair Color: BROWN | Expiration Date: |
| Date Of Birth: 09/01/1986 | Hair Length: SHORT | Relation to Victim: STRANGER |
| U.S. Citizen: YES | Hair Style: CLOSE CUT | Living together: NO |
| Place Of Birth: USA | Skin Tone: LIGHT | Can be Identified: YES |
| Need Interpreter: NO | Complexion: CLEAR | |
| Language: | | |
| Accent: NO | Soc.Security #: 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 | |
| | Occupation: UNKNOWN | Gang Affiliation: NO |
| Physical Condition: APPARENTLY NORMAL | Lic/Permit Type: | Name: |
| Drug Used: NONE | Lic/Permit No: | Identifiers: |

| LOCATION | ADDRESS | CITY | STATE/CNTRY | ZIP | APT/ROOM | PCT |
|---|---|---|---|---|---|---|
| HOME-PERMANENT | 1755 YORK AVENUE | MANHATTAN | NEW YORK | | | 019 |

**Phone # and E-Mail Address:**

N.Y.C.H.A. Resident: NO   N.Y.C. Housing Employee: NO   On Duty: NO

Development:   N.Y.C. Transit Employee: NO

**Physical Force:** USED

| Gun: | | | |
| Weapon Used/Possessed: NONE | | Make: | Recovered: |
| Non-Firearm Weapon: | | Color: | Serial Number Defaced: |
| Other Weapon Description: | | Caliber: | Serial Number: |
| | | Type: | |
| | | Discharged: NO | |

| Used Transit System: NO |
| Station Entered: |
| Time Entered: |
| Metro Card Type: |
| Metro Card Used/Poses: |
| Card #: |

| CRIME DATA | DETAILS |
|---|---|
| STATEMENTS MADE | DONT FUCK WITH ME GET OUT OF MY WAY |
| MODUS OPERANDI | UNKNOWN |
| ACTIONS TOWARD VICTIM | PUNCHED |
| CLOTHING | ACCESSORIES - SHORTS - BLACK |
| CLOTHING | FOOTWEAR - SNEAKERS - WHITE |
| CLOTHING | OUTERWEAR - T-SHIRT OR TANK TOP - BROWN |
| CLOTHING | HEADGEAR - UNK - UNKNOWN COLOR |
| CHARACTERISTICS | UNKNOWN |
| BODY MARKS | -UNKNOWN |
| BODY MARKS | -UNKNOWN |
| IMPERSONATION | UNKNOWN |

## JUVENILE DATA: 
Arrest #: M11677089

| Juvenile Offender: | Relative Notified: | Personal Recog: |
| Number Of Priors: 0 | Name: | |
| School Attending: | Phone Called: | |
| Mother's Maiden Name: | Time Notified: | |

## ASSOCIATED ARRESTS: 
Arrest #: M11677089

| ARREST ID COMPLAINT # |

## DEFENDANTS CALLS: 
Arrest #: M11677089

| CALL # | NUMBER DIALED | NAME CALLED |
|---|---|---|
| 1 | 917-620-5417 | RAQUEL |

## INVOICES: 
Arrest #: M11677089

| INVOICE COMMAND PROPERTY TYPE VALUE |

## ARRESTING OFFICER: POM MICHAEL FARINACCIO 
Arrest #: M11677089

| Tax Number: 936570 | On Duty: YES | Force Used: NO |
| Other ID (non-NYPD): 936570 | In Uniform: YES | Type: |
| Shield: 16315 | Squad: NS | Reason: |
| Department: NYPD | Chart: 29 | Officer Injured: NO |
| Command: 019 | Primary Assignment: | |

| Arresting Officer Name: POM FARINACCIO, MICHAEL | Tax #: | Command: 019 | Agency: NYPD |
| Supervisor Approving: SGT ROMANCE RICHAR | Tax #: | Command: 019 | Agency: NYPD |
| Report Entered by: POM FARINACCIO, MI | Tax #: | Command: 019 | Agency: NYPD |



# END OF ARREST REPORT
# M11677089



Print this Report     Add an another Arrest

## Lenox Hill Hospital - New York, NY 10075-1850

| Patient: | MARTONI, FRANK | DOB: | 9/14/1962 |
|---|---|---|---|
| MR #: | 5607216 | Age/Gender: | 48y M |
| DOS: | 9/2/2011 13:29 | Acct #: | 102010848 |
| Private Phys: | PATRICK MIZRAHI, MD/DO | ED Phys: | Richard Leno, MD |

### HISTORY OF PRESENT ILLNESS

**Note**
Chief complaint: assault
HPI: Pt. is a 48 y.o. male c/o being assaulted at work prior to arrival. Pt. was hit in the left face with a fist. There was no LOC. Now pt. has HA, swelling around the left eye and bleeding in the left eye. Pt. denies any dizziness, N/V, visual or hearing changes, sensory or motor deficit, neck pain or stiffness, change in MS. Pt. is not on blood thinners. <N2V 09/03/11 23:09 >
   The patient was not offered HIV testing because of a medical condition that includes but is not limited to an emergent condition or altered mental status. <N2V 09/03/11 23:09 >
Medical screening complete. <N2V 09/03/11 23:09 >
I have acknowledged the transfer of care for this patient. <N2V 09/03/11 23:09 >

### PAST HISTORY

**Past Medical/Surgical History**
   Home medications: Patient not currently taking any medications. < ECH 9/2/2011 13:32 >
   The patient's pertinent past medical history is as follows: Hypothyroidism < ECH 9/2/2011 13:32 >
The patient's pertinent past surgical history is as follows: No significant problems < RHC 9/2/2011 15:54 >
At the time of this signature, I have reviewed and confirm the documented Past History. <N2V 09/03/11 22:52 >

**Social History**
No significant social history. <N2V 09/03/11 22:52 >

### REVIEW OF SYSTEMS

**Musculoskeletal**
Please see HPI

CONSTITUTIONAL: No fever, chills
EYES: No visual changes, eye pain or discharge
ENT: No ear pain; hearing changes, ear discharge, no nasal discharge
GI: No nausea, vomiting,
MS: No myalgia, muscle weakness, joint pain, neck pain
SKIN: laceration left eyebrow
NEURO: + headache, no confusion, no head trauma, no motor weakness, no paresthesias, no speech difficulty

All other systems are negative except as noted above or in HPI
<N2V 09/03/11 23:11 >

### EXAM
VITAL SIGNS: I have reviewed nursing notes and confirm.

12/8/2017                                                OUR DEFENSE - mitchtaebel@gmail.com - Gmail

## OUR DEFENSE

 **Mitch Taebel**  Hello Amelia, I hope you had a good weekend. I would like to further discuss ...

**Mc Govern, Amelia** <AMcgovern@legal-aid.org>
to me

Mr. Traebel,

Yes, I will subpoena videotape, but DA may have possession already.

Neither the police nor the da will allow a "countercharge"--the only time the police will accept a complaint from a defendant on an open case is when there is some new conduct by the compl and make a statement which could be used against you in this case.

What has been going on? Has he said anything to you? Please keep me informed as to anything that he says to you. Keep track of dates and times.

Yes, doorman should not have used physical force and will look into this type of self defense type defense.

████████████████████████████████████████████████████████████████████████████████████████

If you are hiring an attorney, please let me know as soon as possible. Further, I am only dealing with your criminal case. Any civil issues should be handled by a civil attorney.

Yours truly,
Amelia McGovern
(I'm sitting in court + wanted to get an answer to you asap--we can talk further at a later time--)

Sent from my Verizon Wireless BlackBerry

From: Mitch Taebel <mitchtaebel@gmail.com>
Date: Mon, 17 Oct 2011 17:42:23 -0400
To: Mc Govern, Amelia<AMcgovern@legal-aid.org>
Subject: OUR DEFENSE

--------------------------------------------------------------------------------
This e-mail, and any attachments thereto, is intended only for use by the addressee(s) and may contain legally privileged and/or confidential informatic or copy this communication.  Please notify the sender that you ████████████████████████████████████████████████

# DONALD FRAZIER

*Attorney at Law*

233 Broadway, Suite 2201
New York NY 10279
(212) 385-3959; Fax: (858) 300-5411
don@donfrazierlaw.com

June 11, 2012

Mr. Mitchell Taebel
2020 Golden Gate Drive
Long Beach IN 46360

Dear Mr. Taebel:

Your next appearance is set for July 25, 2012 at 100 Centre Street. Unfortunately the posture of the case has changed—to your detriment.

It is generally wise to dispose of a criminal matter without trial if such opportunity is allowed. Such opportunity is less available now.

The prosecutor has filed an indictment, raising the charge to a Class E felony (PL110.05(6)), with a potential sentence of years in prison. However since my work focuses on misdemeanors, at the next appearance I will seek to be relieved so that felony counsel can be appointed for you.

I advise that you authorize me to attempt to negotiate a plea offer of a misdemeanor without jail time. Since your case has progressively become more difficult to resolve, I make no promises but believe it would wise to try to cut your potential losses as quickly as possible immediately.

Sincerely,

Donald Frazier

# Exhibit E

Evidence the defense had prior trial

**Defense Evidence:**

*Martoni's statements to the Grand Jury/Conflicting statements from Building Manager (Andrea Weinbaum) 4pg.

*Credit Card Statements 10pg.

*Paypal Mail-Orders to 1755 York Ave and Local NY Sports Club membership. 10pg.

*Justification of Self-Defense in Law (Sec. 35.27 NY Penal Code) 4pg.

*Unlawful restrictions on Occupancy/Roomate Law (NY Code-Sec. 235-F) 3pg.

*Image of Text from Mitch Taebel to Raquel Toro Regarding Frank on May 24th 2011.   1pg.

*Signed and notarized statement/letter to the DA by Raquel Toro.  1pg.

*Photocopy of mail addressed to 1755 York Ave.  1pg.

*DVD/Video of Barclay Lobby area   1 disc.
  •

Martoni

1   Mitchell Taebel?

2          A.    Yes, sir, I do.

3          Q.    How do you know that person?

4          A.    He came to be known as the

5   boyfriend of our tenant Rachel Toro.

6          Q.    Approximately, when did you first

7   meet this person?

8          A.    Sometime in August.

9          Q.    Of?

10         A.    2011.

11         Q.    How did you meet him?

12         A.    I had seen him with the tenant when

13  they would leave in the mornings.  I had also

14  been told one morning that her boyfriend was

15  not allowed in the building.

16              MR. ROONEY:  I'd like to instruct

17         the Grand Jury at this time the witness

18         has testified to something that someone

19         else said.  You are not to consider that

20         towards truth, but only toward effect on

21         him to explain his next actions based on

22         what he says he was told.

23         Q.    Please continue.

24         A.    Mitchell came into the building and

25  I said I'm sorry you're not allowed in.  He

Martoni

1   roommate?   No.

2        Q.    Can you describe his demeanor --

3   Mr. Taebel's demeanor as he had these

4   conversations with you and Andrea?

5        A.    In my opinion both of them were

6   very aggressive because when I stopped him and

7   when Andrea introduced herself to try and

8   resolve the situation he came towards us.

9        Q.    What did you do, if anything, as he

10  was speaking to Andrea?

11       A.    I grabbed -- we have two radios;

12  one is the building radio and the other one I'm

13  not sure what they call it these days, but it's

14  basically to get in touch with someone who can

15  get in touch with the police.  I grabbed the

16  one for the building and we were taught not to

17  let people get behind you.  I started backing

18  up.  If you saw the lobby you walk in I'm here

19  at the podium, there's a little space and then

20  there's a little corridor where we have three

21  passenger elevators.  If you're facing them

22  number 1 and number 2 will be on your left

23  number 3 is on your right.  I started to back

24  up to -- my objective was to just not let the

25  elevator leave.  You can put your foot, your

Martoni

1   arm.  There are sensors and to call my super

2   for assistance.  Elevator number 3 opened up, I

3   turned to go towards the elevator, I heard

4   Mitchell say what's your fucking problem Frank.

5   Next thing I know I hear -- you can actually

6   hear cracks.  Two shots to this side of my face

7   -- the left side by the eye.  I staggered.  He

8   almost knocked me into the elevator not all the

9   way in.  I just grabbed on and pulled myself

10  out.  As I'm coming out I hear the same voice

11  again say what's your fucking problem frank.  I

12  got two more shots to the side of my head in

13  the same place.  Now I'm on the other side

14  where elevators 1 and 2 are and I turned to my

15  left to see the elevator and the person I seen

16  in there is Mitchell Taebel and the elevator

17  door closed.  I took --

18       Q.   Can you just back up.  As you're

19  walking back toward the corridor excuse me down

20  the corridor toward the elevators did you see

21  any other individuals in that area?

22       A.   There was nobody there.

23       Q.   How about afterwards when you

24  turned around were there any other people in

25  that corridor?

~~Soggetto~~ Bldg mgr - 3/20/12

Where she saw mem go?

~~Soggetto correggere~~

Didn't see punch b/c D pushed doorman into elevator (Men pushed)

Saw Frank come out of elevator holding his eye

Heard D saying Frank you've seen me before - stop giving me such a hard time

Frank SS - u need permission to enter + don't have it

Frank wasn't aggressive

Statement Date: 05/05/11 - 06/05/11
Account Number: 5401 6830 6045 3875

Page 2 of 3
OVER

## ACCOUNT ACTIVITY (CONTINUED)

◀ = Web Transaction

| Date of Transaction | Merchant Name/Transaction | $ Amount |
|---|---|---|
| 05/06 | | 3.39 |
| 05/07 | UNION 76  00457890 MOHOLL RECCCOCCA | 75.91 |
| 05/06 | CHEVRON 0098873 SYLMAR CA | 49.63 |
| 05/06 | POZIS GRILL TARZANA CA | 10.58 |
| 05/07 | | 10.70 |
| 05/06 | CASTLE BATTING CAGES WOODLAND HILLS CA | 15.00 |
| 05/06 | | 3.82 |
| 05/06 | POQUITO MAS UNIVERSAL STUDIO CC CA | 7.41 |
| 05/10 | CHEVRON 0308875 INGLEWOOD CA | 27.31 |
| 05/09 | CASTLE BATTING CAGES WOODLAND HILLS CA | 19.00 |
| 05/09 | SUBWAY   08057593 PACIFIC PALIS CA | 3.77 |
| 05/09 | | 6.45 |
| 05/10 | MTA MVM 125 ST SLPS 718-330-1234 NY | 10.00 |
| 05/10 | | 34.33 |
| 05/12 | | 14.25 |
| 05/12 | MTA MVM 96 ST SLPS 718-330-1234 NY | 10.00 |
| 05/12 | | 26.00 |
| 05/13 | B & H PHOTO-VIDEO MOT 800-947-9950 NY | 484.83 |
| 05/12 | B & H PHOTO-VIDEO RETA 999-9999999 NY | 484.83 |
| 05/14 | MTA MVM 83 ST REG STREET SLPS 718-330-1234 NY | 20.00 |
| 05/14 | FIRST OM FIRST DELI MINH YORK NY | 12.00 |
| 05/14 | SALA THAI RESTAURANT NEW YORK NY | 33.32 |
| 05/15 | MODELL'S #85 MANHATTAN NY | 29.99 |
| 05/15 | BIKRAM YOGA NEW YORK NY | 20.00 |
| 05/17 | MCDONALD'S F4046 BROOKLYN NY | 6.05 |
| 05/16 | AMOB (866)790-6559 DE | 19.99 |
| 05/17 | ACADEMY BUS LINES NEW YORK NY | 20.00 |
| 05/17 | | 48.00 |
| 05/16 | | 175.00 |
| 05/17 | SUNSET TAVERN BURLINGTON NJ | 52.00 |
| 05/17 | | 81.90 |
| 05/17 | | 76.25 |
| 05/18 | IHOP NUMBER 38854 BURLINGTON NJ | 26.39 |
| 05/18 | | 6.00 |
| 05/19 | | 7.61 |
| 05/19 | MTA MVM KOSCIUSKO SLPS 718-330-1234 NY | 29.00 |
| 05/21 | SHADES OF GREEN PUB AN NEW YORK NY | 28.50 |
| 05/23 | | 36.90 |
| 05/23 | TINY THAI NEW YORK NY | 22.84 |
| 05/26 | DUANE READE #0351  Q04 NEW YORK NY | 11.99 |
| 05/26 | Best Buy   00008509 NEW YORK NY | 16.32 |
| 05/27 | | 20.00 |
| 05/03 | NYC TAXI MED 2K00 BRONX NY | 8.60 |
| 06/01 | MTA MVM 86TH STREET SLPS 718-330-1234 NY | 29.00 |

INTEREST CHARGED

| 06/05 | PURCHASE INTEREST CHARGE | 25.58 |

TOTAL INTEREST FOR THIS PERIOD  $25.58

---

**2011 Totals Year-to-Date**

| Total fees charged in 2011 | $0.00 |
| Total interest charged in 2011 | $64.95 |

Year-to-date totals reflect all charges minus any refunds applied to your account

---

## INTEREST CHARGES

Your Annual Percentage Rate (APR) is the annual interest rate on your account

| Balance Type | Annual Percentage Rate (APR) | Balance Subject To Interest Rate | Interest Charges |
|---|---|---|---|
| PURCHASES | | | |
| Purchases | 14.24% (v) | $2,114.86 | $25.58 |
| CASH ADVANCES | | | |
| Cash advances | 19.24% (v) | -0- | -0- |
| BALANCE TRANSFERS | | | |
| Balance transfers | 14.24% (v) | -0- | -0- |

X 000000  P0000001  1         0D3  #  6  1N  172528        Page 2 of 3         97025   U A M 4  25/70   14575/0057/07QY/0070



| Payment Due Date | New Balance | Past Due Amount | Minimum Payment |
|---|---|---|---|

Account number: 5401 6830 8345xxxx

$ _____

Make your check payable to:
Chase Card Services.
Please write amount enclosed.
New address or e-mail? Print on back.

540168308345387500002600001202550000000000000005

4056 SCL# 16371 G
MITCHELL T TAGGS
2030 COLDINGGATE DR

CARDMEMBER SERVICE
PO BOX 84014
PALATINE IL 60094-4014

50001602B   20930831 45xxxxx

## CHASE freedom

Manage your account online:
www.chase.com/creditcards

Customer Service
1-800-945-8800

Additional contact information on back

### ACCOUNT SUMMARY

| Account Number: 5401 6830 8345 3875 | |
|---|---|
| Previous Balance | $1,330.64 |
| Payment, Credits | -$1,038.00 |
| Purchases | +$582.67 |
| Cash Advances | $0.00 |
| Balance Transfers | $0.00 |
| Overdraft | $0.00 |
| Fees Charged | $0.00 |
| Interest Charges | +$16.24 |
| New Balance | $1,292.55 |
| | |
| Opening/Closing Date | 05/06/11 - 06/05/11 |
| Total Credit Line | $3,700 |
| Available Credit | $2,407 |
| Cash Access Line | $740 |
| Available for Cash | $740 |

### PAYMENT INFORMATION

| New Balance | $1,292.55 |
|---|---|
| Payment Due Date | 06/02/11 |
| Minimum Payment Due | $26.00 |

Late Payment Warning: If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $35.00 and your APR's will be subject to increase to a maximum Penalty APR of 29.99%.

Minimum Payment Warning: If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 6 years | $1,792 |
| $41 | 3 years | $1,486 (Savings $306) |

If you would like information about credit counseling services, call 1-866-797-2885.

### CHASE FREEDOM REWARDS SUMMARY

| Previous Points Balance | 10,325 |
|---|---|
| Points earned on purchases | 884 |
| 10% Bonus Points per $1 You Spend | 80 |
| Bonus 10 Points on Every Purchase | 310 |
| Current Points Total | 11,618 |

Have you gotten your reward yet? Take a look at how many points you've earned and log onto Ultimate Rewards today. You can get cash back, gift cards, merchandise and more! See your options at www.chase.com/ultimaterewards. So treat yourself - you earned it!

As a Chase Checking℠ customer, you earn more cash back for all your spending. You get 1 point for every $1 you spend, plus you will receive 10% bonus points per $1 spent and 10 bonus points on every purchase. Redeeming your points for cash back is easy! You can receive a check, statement credit, or even direct deposit into your Chase Checking account.

### ACCOUNT ACTIVITY

| Date of Transaction | Merchant Name or Transaction Description | $ Amount |
|---|---|---|
| | PAYMENTS AND OTHER CREDITS | |
| 05/13 | Payment - Thank You | -38.00 |
| 05/21 | Payment - Thank You | -1,000.00 |
| | PURCHASES | |
| 05/05 | | 10.00 |
| 05/08 | JAMBA JUICE #684 NEW YORK NY | 12.90 |
| 05/08 | | 8.95 |
| 05/06 | B & H PHOTO-VIDEO RETA 212-220-300 NY | 68.54 |
| 05/07 | *Best Buy   00008359 NEW YORK NY | 15.32 |
| 05/08 | MTA MVM 86TH STREETOPS 718-330-1234 NY | 29.00 |
| 05/10 | NAILSCURE NEW YORK NY | 25.00 |
| 05/11 | DELIZIA 92 NEW YORK NY | 35.98 |
| 05/13 | | 38.00 |
| 05/13 | USPS CHANGE OF98100250 MEMPHIS TN | 1.00 |
| 05/13 | USPS CHANGE OF06100908 MEMPHIS TN | 1.00 |

Page 1 of 7

July

| Payment Due Date | New Balance | Past Due Amount | Minimum Payment |
|---|---|---|---|
| 09/01/11 | $3,229.45 | $0.00 | $58.00 |

Account number: 5401 6830 8345 3875

$ _____

Make your check payable to:
Chase Card Services
Please note amount enclosed.
New address or e-mail? Print on back.

5401683083453875000058000032294500000000000002

MITCHELL T YACIRI
2028 GOLDENGATE DR

CARDMEMBER SERVICE
PO BOX 94014
PALATINE IL 60094-4014

500016028   2093083453

## CHASE freedom

Manage your account online:
www.chase.com/creditcards

Customer Service
1-800-945-2000

Additional contact
information on back

### ACCOUNT SUMMARY

Account Number: 5401 6830 8345 3875

| | |
|---|---|
| Previous Balance | $1,202.55 |
| Payment, Credits | -$603.86 |
| Purchases | +$2,604.86 |
| Cash Advances | $0.00 |
| Balance Transfers | $0.00 |
| Overdrafts | $0.00 |
| Fees Charged | $0.00 |
| Interest Charged | +$325.82 |
| New Balance | $3,229.45 |
| Opening/Closing Date | 07/09/13 - 08/03/11 |
| Total Credit Line | $3,700 |
| Available Credit | $470 |
| Cash Access Line | $740 |
| Available for Cash | $470 |

### PAYMENT INFORMATION

| | |
|---|---|
| New Balance | $3,229.45 |
| Payment Due Date | 09/01/11 |
| Minimum Payment Due | $58.00 |

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $35.00 and your APRs will be subject to increase to a maximum Penalty APR of 29.99%.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 14 years | $8,296 |
| $111 | 3 years | $3,992 (Savings=$7,294) |

If you would like information about credit counseling services, call 1-866-797-2885.

### CHASE FREEDOM REWARDS SUMMARY

| | |
|---|---|
| Previous Points Balance | 11,818 |
| Points earned on purchases | 2,629 |
| 10% Bonus Points per $1 You Spend | 854 |
| Bonus 10 Points on Every Purchase | 410 |
| Current Points Total | 14,812 |

Have you gotten your reward yet? Take a look at how many points you've earned and log onto Ultimate Rewards today. You can get cash back, gift cards, merchandise and more! See your options at www.chase.com/ultimaterewards. So treat yourself - you earned it!

As a Chase Checking SM customer, you earn more cash back for all your spending! You get 1 point for every $1 you spend, plus you will receive 10% bonus points per $1 spend and 10 bonus points on every purchase. Redeeming your points for cash back is easy! You can receive a check, statement credit, or even direct deposit into your Chase Checking account.

### ACCOUNT ACTIVITY

‡ Risk Transaction

| Date of Transaction | Merchant Name or Transaction Description | $ Amount |
|---|---|---|
| | **PAYMENTS AND OTHER CREDITS** | |
| 07/12 | Payment - Thank You | -28.00 |
| 07/23 | MODELL'S #65 MANHATTAN NY | -84.99 |
| 07/24 | PETCO 9713  6358F136 NEW YORK NY | -90.00 |
| 08/02 | Payment - Thank You | -500.00 |
| | **PURCHASES** | |
| 07/01 | | 79.00 |
| 07/06 | ♦Best Buy   00008099 NEW YORK NY | 30.48 |
| 07/08 | SALA THAI RESTAURANT NEW YORK NY | 31.41 |
| 07/08 | MTA MVM 96TH STREETOPS 718-330-1234 NY | 5.50 |
| 07/11 | MTA MVM 96TH STREETOPS 718-330-1234 NY | 28.00 |
| 07/13 | THE VINEGAR FACTORY NEW YORK NY | 10.77 |
| 07/15 | B & H PHOTO-VIDEO HELA 212-239/900 NY | 451.90 |
| 07/14 | MCDONALD'S F17480 NEW YORK NY | 8.28 |
| 07/16 | | 1.06 |

0000001   11232200 C 1        800   Y  9  00   1105045        Page 1 of 2        00026   MA MA  X0070   31.71000001000219 REF
X 0400

*August*

| Payment Due Date | New Balance | Past Due Amount | Minimum Payment |
|---|---|---|---|

Account number: 6401 6830 8345 3876

Make your check payable to:
Chase Card Services
Please write amount enclosed.
New address or e-mail? Print on back.

$ _____ . _____

5401663083453875000073000032474900000000000003

MITCHELL T TAEBEL
2020 FOX DINGGATT DR
MICHIGAN CITY IN 46360-1487

CARDMEMBER SERVICE
PO BOX 94014
PALATINE IL 60094-4014

5000160 28   20930834538751

## CHASE freedom

Manage your account online
www.chase.com/creditcards

Customer Service
1-800-945-2000

Additional contact
information on back

### ACCOUNT SUMMARY

| | |
|---|---|
| Account Number: 6401 6830 8345 3876 | |
| Previous Balance | $3,229.45 |
| Payment, Credits | -$600.00 |
| Purchases | +$577.84 |
| Cash Advances | $0.00 |
| Balance Transfers | $0.00 |
| Overdrafts | $0.00 |
| Fees Charged | +$9.79 |
| Interest Charged | +$30.34 |
| New Balance | $3,247.49 |
| Opening/Closing Date | 08/05/11 – 09/05/11 |
| Total Credit Line | $3,700 |
| Available Credit | $452 |
| Cash Access Line | $740 |
| Available for Cash | $452 |

### PAYMENT INFORMATION

| | |
|---|---|
| New Balance | $3,247.49 |
| Payment Due Date | 10/03/11 |
| Minimum Payment Due | $71.00 |

Late Payment Warning: If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $35.00 and your APRs will be subject to increase to a maximum Penalty APR of 29.99%.

Minimum Payment Warning: If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 14 years | $6,207 |
| $117 | 3 years | $4,014 (Savings=$2,093) |

If you would like information about credit counseling services, call 1-866-797-2885.

### CHASE FREEDOM REWARDS SUMMARY

| | |
|---|---|
| Previous Points Balance | 14,812 |
| Points earned on purchases | 578 |
| 10% Bonus Points on $1 You Spend | 58 |
| Bonus 10 Points on Every Purchase | 170 |
| Current Points Total | 15,618 |

Have you gotten your reward yet? Take a look at how many points you've earned and log onto Ultimate Rewards today. You can get cash back, gift cards, merchandise and more! See your options at www.chase.com/ultimaterewards. So treat yourself - you earned it!

As a Chase Checking℠ customer, you earn more cash back for all your spending! You get 1 point for every $1 you spend, plus you will receive 10% bonus points per $1 spent and 10 bonus points on every purchase. Redeeming your points for cash back is easy! You can receive a check, statement credit, or even direct deposit into your Chase Checking account.

### ACCOUNT ACTIVITY

◀ 64th Transaction



| Date of Transaction | Merchant Name or Transaction Description | $ Amount |
|---|---|---|
| | PAYMENTS AND OTHER CREDITS | |
| 08/08 | Payment - Thank You | -100.00 |
| 08/28 | Payment - Thank You | -500.00 |
| | PURCHASES | |
| 07/31 | ▬▬▬▬▬▬▬▬▬▬▬ | 10.00 |
| 08/05 | ▬▬▬▬▬▬▬▬▬▬▬ | 29.25 |
| | ▬▬▬▬▬▬▬ | |
| 08/17 | ▬▬▬▬▬▬▬ | 48.00 |
| 08/22 | ▬▬▬▬▬▬▬▬▬ | 28.35 |
| 08/24 | ▬▬▬▬▬▬▬▬ | 10.00 |
| 08/24 | SOUTHWES 5262195460030 G600435J792 TX | 216.40 |
| | 0630111 H    LAX    MDW | |
| | 2 H    MDW    LGA | |
| 08/25 | LA SALSA #96    OPS MALIBU CA | 2.75 |

History – PayPal

**Taebel, Mitchell   PayPal History**   12/8/12 10:08 PM

## Payments sent - Apr 24, 2011 to Sep 8, 2011

| Date | Type | Name/Email | Payment status | Order status/Actions | Net amount |
|------|------|------------|----------------|----------------------|------------|
| Jun 7, 2011 | Payment To | jamndeals | Completed | Shipped | -$85.00 USD |
| May 25, 2011 | Payment To | Neoteric Solution, Inc. | Completed | Shipped | -$32.98 USD |
| May 14, 2011 | Payment To | Yall Inc. | Refunded | Shipped | -$5.43 USD |
| May 13, 2011 | Payment To | Town Sports International LLC | Completed | | -$30.00 USD |



**NYSC**
new york
sports clubs



6 Penn Plaza, 4th floor  •  New York, NY 10001

myClubNetworks   Front Desk   Contacts   Sales   Scheduling   Financial   Help

MAINTENANCE                                                    v1.33.70 @ 10.1.4.112

clubNetworks

Interests   Session   Emergency   Contact History   Reservations   Guest Program   Guest Pass   Purchase History   Picture

## GENERAL INFORMATION

Membership Number   3605990

| | | | |
|---|---|---|---|
| Title: | Mr. | Gender: | M |
| First Name: | mitch | Middle Name: | |
| Last Name: | taebel | Email: | |
| Barcode: | | Username: | mithecatael85 |
| Phone: | Home Phone | (219) 871-9637 | Date of Birth: 9/1/1986 |
| Price Group: | Prospect Standard | | |
| Interest Level: | Low | | |

## ADDRESS INFORMATION

| | | | |
|---|---|---|---|
| Address Type: | Mailing Address | | |
| Address Line 1: | 1755 york ave apt 2a | Address Line 2: | |
| City: | new york | State: | NY |
| Zip Code: | 10128 | | |

Save   Reset   Cancel

# Member Usage Report

**Date Range: 05/16/2011 To 06/15/2011**

| Club Used | Member Number | Member First Name | Member Last Name | Date/Time |
|---|---|---|---|---|
| **Manhattan - Uptown East** | | | | |
| **TSI East 91, LLC** | | | | |
| | 3605990 | mitch | taebel | 5/26/2011 10:11:11AM |
| | 3605990 | mitch | taebel | 5/27/2011 11:47:09AM |
| | 3605990 | mitch | taebel | 6/1/2011 9:07:12AM |
| | 3605990 | mitch | taebel | 6/2/2011 9:59:01AM |
| | 3605990 | mitch | taebel | 6/5/2011 10:52:48AM |
| | 3605990 | mitch | taebel | 6/7/2011 8:34:40AM |
| | 3605990 | mitch | taebel | 6/13/2011 12:21:25PM |
| **Total Sessions per Member:** | 7 | | | |

This document contains privileged and confidential information. Unauthorized use of this information is a violation of the confidentiality provisions of the TSI Employee Handbook.
Violators of these provisions will be subject to disciplinary action up to, and including, termination of employment.
If you detect an error on this report, please email "Club Support".

Printed on 1/14/2013 4:36:20 pm

**JUSTIFICATION:**
**USE OF PHYSICAL FORCE**
**IN DEFENSE OF A PERSON**
**PENAL LAW 35.15**
**(Effective Sept. 1, 1980)**

---

*NOTE: This charge should precede the reading of the*
*elements of the charged crime, and then, the final element*
*of the crime charged should read as follows:*

*"and, #. That the defendant was not justified."* [1]

---

[With respect to count(s) (*specify*),] [T]he defendant has raised the defense of justification, also known as self defense. The defendant, however, is not required to prove that he was justified. The People are required to prove beyond a reasonable doubt that the defendant was not justified.

I will now explain our law's definition of the defense of justification as it applies to this case.

Under our law, a person may use physical force upon another individual when, and to the extent that, he/she reasonably believes it to be necessary to defend himself/herself [or someone else] from what he/she reasonably believes to be the use or imminent use of [unlawful[2]] physical force by such individual.

The determination of whether a person REASONABLY BELIEVES physical force to be necessary to defend himself/herself [or someone else] from what he/she reasonably believes to be the use or imminent use of physical force by another individual requires the application of a two-part test.[3] That test applies to this case in the following way:

First, the defendant must have actually believed that (*specify*) was using or was about to use physical force against him/her [or someone else], and that the defendant's own use of

# New York Law Journal

VOLUME 227—NO. 1

Web address: http://www.nylj.com

WEDNESDAY, JANUARY 2, 2002

## COOPERATIVES AND CONDOMINIUMS

BY RICHARD SIEGLER

### The Roommate Law Revisited

SECTION 235 (f) was added to the Real Property Law by the Omnibus Housing Act of 1983.¹ Dubbed the "Roommate Law," it was enacted to accommodate a tenant's need, by lifestyle or necessity, to live with a roommate. The law has been held applicable to a cooperative housing corporation, but not a condominium, and has seemingly stripped some of the powers of a co-op board, most notably, its ability to restrict subletting.

This column updates prior articles dealing with the Roommate Law, examines recent developments and explores what a co-op board can do to maintain its control of subletting from further erosion.²

#### Origin

For a landlord, an ideal situation would be to limit the occupancy of an apartment to named tenants and members of the tenant's immediate family. Prior to the passage of the Roommate Law, the Court of Appeals in *Hudson View v. Weisz* enforced a restrictive covenant in the tenant's lease that limited occupancy to the tenant and members of the tenant's immediate family. The 1983 legislation effectively overruled Hudson View, granting the tenant the right to have a co-occupant if he or she chose to. The Legislature determined that the act was "necessary to protect the public health, safety and general welfare" and sought to increase the protection of thousands of households consisting of unrelated inhabitants who live together for reasons of



"economy, safety and companionship," who were in jeopardy of losing their homes.⁴

The Roommate Law provides that a tenant may share his or her apartment with one additional occupant, without first gaining the permission of a landlord.⁵ The additional occupant does not have to be an immediate family member of the named tenant and a landlord is prohibited, "by express lease terms or otherwise," from restricting occupancy to a tenant or tenants and their immediate family.⁶ Therefore, if one tenant enters into a lease, §235(f)(3) will permit occupancy by the named tenant, his or her immediate family, one additional occupant, and dependent children of the occupant.

Section 235 (f)(4), which deals with units having two or more tenants, appears to place some restraint on the number of occupants allowed in an apartment by limiting the total number of persons, tenants or occupants, to the number of persons named in the lease. The wording here is somewhat ambiguous and thus subject to different constructions. An "immediate family member" is not within the definition of either "tenant" or "occupant" and therefore it appears should not be included in the accounting.⁸ The dependent children of any occupants should also not be included in the count. As a result, it seems that the accounting is made up of only tenants and occupants. Based upon this analysis, if two tenants are on

the lease and one moves out, only one occupant and his dependent children can be added without first obtaining the permission of the landlord. If both tenants remain, no additional occupant is permitted.⁹

Section 235(f)(7) expressly prohibits the waiver of any rights conferred by the provisions of the law. It specifically states that any provision of a lease or rental agreement purporting to waive a tenant's right under this section is void as contrary to public policy.¹⁰

While §235(f) has been successful in providing certain occupancy rights to those unrelated persons who reside in the same dwelling, there are a few details that the statute fails to address, which to some extent are still at issue today. For example, while the statute defines "Tenant" and "Occupant," it does not define "Immediate Family." Additionally, although the courts have upheld its applicability in a co-op setting, the statute fails to expressly include co-ops or condominiums. Moreover, assuming the applicability of the statute to co-ops, does the statute render proprietary lease restrictions on subletting meaningless? Section 235(f) also falls short in providing guidance as to what rent a tenant may charge a roommate and whether that rent must be "reasonable." In the past 15 years, several cases dealing with these issues have come before the courts.

#### Applicability to Co-ops

While co-ops have traditionally been considered a unique form of housing, significantly differing from rental property, courts have consistently held that the protection provided by §235(f) to tenants applies to co-op tenant-shareholders.¹²

One of the earliest decisions about the applicability of §235(f) in a co-op setting was *Southridge Cooperative Section No. 3 Inc. v. Menendez*.¹³ There, the court stated "it has been

**Richard Siegler** *is a partner in the New York City law firm of Stroock & Stroock & Lavan LLP and is an Adjunct Professor at New York Law School where he teaches a course on cooperative housing and condominium law.* **Eriann Padula,** *a student at New York Law School, assisted in the preparation of this article.*

# N.Y. RPP. LAW § 235-f : NY Code - Section 235-F: Unlawful restrictions on occupancy

## Search N.Y. RPP. LAW § 235-f : NY Code - Section 235-F: Unlawful restrictions on occupancy

- Search by Keyword or Citation

Search

1.  As used in this
    section, the terms:
        (a) "Tenant" means a person occupying or entitled to occupy a residential rental premises who is either a party to the lease or rental agreement for such premises or is a statutory tenant pursuant to the emergency housing rent control law or the city rent and rehabilitation law or article seven-c of the multiple dwelling law.
        (b) "Occupant" means a person, other than a tenant or a member of a tenant's immediate family, occupying a premises with the consent of the tenant or tenants.
    2.  It shall be unlawful for a landlord to restrict occupancy of residential premises, by express lease terms or otherwise, to a tenant or tenants or to such tenants and immediate family. Any such restriction in a lease or rental agreement entered into or renewed before or after the effective date of this section shall be unenforceable as against public policy.
    3.  Any lease or rental agreement for residential premises entered into by one tenant shall be construed to permit occupancy by the tenant, immediate family of the tenant, one additional occupant, and dependent children of the occupant provided that the tenant or the tenant's spouse occupies the premises as his primary residence.
    4.  Any lease or rental agreement for residential premises entered into by two or more tenants shall be construed to permit occupancy by tenants, immediate family of tenants, occupants and dependent children of occupants; provided that the total number of tenants and occupants, excluding occupants' dependent children, does not exceed the number of tenants specified in the current lease or rental agreement, and that at least one tenant or a tenants' spouse occupies the premises as his

## Messages   **Mitch Taebel**   Edit

your mom.

May 24, 2011 12:46 PM



May 24, 2011 2:27 PM

How nice it was to see frank again

May 24, 2011 6:25 PM

Please call me ASAP

May 25, 2011 1:48 AM

**Send**

September 24th, 2012

Raquel Toro
4-83 48th Ave, Apt 3B
Long Island City, NY 11109

Re: Indictment # 2536/12

To all whom this may concern,

I urge you to dismiss this case.

Mr. Taebel and I began dating in March of 2011 where he began visiting the building regularly. We began living together at the Barclay (1755 York ave. Apt 27A, New York, NY) in early May 2011. Prior to this I had filled out a temporary permission slip directly with the doormen. Mr. Taebel left for one week in May. Before his return on May 23rd, I went into Andrea Weinbaum's office, Residence Manager for the Barclay, and filled out another permission slip for Mr. Taebel through the end of June. At that point I informed Ms. Weinbaum that Mr. Taebel was my boyfriend and would be staying with me indefinitely.

On May 24th, Frank Martoni accused Mr. Taebel of not having permission to be there as he entered the building. Frank called the manager's office, and was informed that Mr. Taebel did indeed have permission.

Mr. Taebel continued to reside at The Barclay past July with no issues. During this time Mr. Taebel was never approached by management or the door staff and I was never asked to fill out an additional permission to enter form. Mr. Taebel subsequently left New York for a few weeks in August to travel. When Mr. Taebel returned the doorman on staff never question Mr. Taebel's permission to enter the building. It wasn't until four days later that Frank Martoni unreasonable tried to physically stop him at the door on Sept. 2nd 2011.

I could write pages about this and go into further detail about every aspect, but to keep this message short and concise, I wish to only express a summery of the matter. Prior to this incident, both Mr. Taebel and myself had already experienced what could easily be considered harassment from the building management. They crossed a much bigger line when they attempted to use physical force, without just reason, to control an occupant of the building.

If necessary I will gladly testify on Mr. Taebel's behalf, however I believe things have only continued to this point due to lies the management told the police and the fact that our side has not been properly represented.

Sincerely,

Raquel Toro

Sworn to before me this 24th day
of September 201[...]
Michelle [signature]

MICHELLE TESSIER
Notary Public - State of New York
NO. 01TE6247617
Qualified in Queens County
My Commission Expires 8/24/15

FROM

Control number
00080 CLIF/PU
Employee's name, address, and ZIP code
PREMIER PARTY SERVICES
LTD
145 W.28TH ST SUITE 10SW
NEW YORK NY 10001

TO

465850146720

MITCH TAEBEL
1755 YORK AVE /A2L
NY/NY 10128



NEW YORK NY 100

20 JAN 2017 PM 1